**Carlos MORALES FELICIANO, et al., Plaintiffs,**

**v.**

**Carlos ROMERO BARCELO, et al., Defendants.**

Civ. A. No. 79–4 (PG).

United States District Court, D. Puerto Rico.

March 21, 1986.

Harvey B. Nachman, Santurce, P.R., for plaintiffs.

Marcos Ramírez–Lavandero, Hato Rey, P.R., for defendants.

PEREZ–GIMENEZ, Chief Judge.

"Prison inmates are voteless, politically unpopular, and socially threatening.... Under these circumstances, the courts have emerged as a critical force behind efforts to ameliorate inhumane conditions....

There is no reason of comity, judicial restraint, or recognition of expertise for courts to defer to negligent omission of officials who lack the resources or moti-

vation to operate prisons within limits of decency...."

Mr. Justice William J. Brennan, *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981).

## MEMORANDUM OPINION

The incarceration as punishment for those convicted of crime, and at times, the detention of those who await trial, are integral components of the administration of criminal law. As any judge must, the Court has accepted and exercised the awesome authority to punish the commission of crime by the deprivation of liberty. Those who are accused of the commission of a crime must at times be detained to assure their presence at trial even if the law holds them to be innocent until their guilt is proven beyond a reasonable doubt. The time is long past, however, when the punishment of crime was the occasion for spectacles of imaginative cruelty or secret torture.

We must punish crime and serious crime must be punished severely. But we must not diminish our humanity by inflicting wanton pain and degrading suffering on those convicted of crime, and we must not punish at all those who wait for the processes of the law to have their innocence or guilt adjudged. The Eighth, Fifth, and Fourteenth Amendments compel our obedience to these salutary principles of political morality which our society has accepted as necessary premises of substantive and procedural criminal law.

The plaintiffs in this class action [1] are all in the custody of the Administration of Correction of the Commonwealth of Puerto Rico (the Administration). Most have been convicted of crime, a substantial minority are pretrial detainees, some have been imprisoned for civil contempt. This is not the first time that the Court is called upon to adjudicate the rights of the plaintiff class,[2] nor does the Court expect that it will be the last: the enforcement of federal injunctive relief for the protection of the constitutional rights of prison inmates is notoriously difficult. Today we commit the authority of this Court to the enforcement of the federal rights of these plaintiffs. The Court is fully aware of the deference which is owed to the sound discretion and exper-

---

**1.** After the commencement of this action several cases have been consolidated herewith: 76–350, *Méndez v. People of P.R.;* 76–543, *Díaz v. Cruz de Batista;* 77–1152, *Guadalupe v. Romero Barceló;* 78–249, Re: *Wilfredo Correa Suárez;* 78–295, *Gonzalez v. Parole Board of P.R.;* 78–1286, *Trujillo v. Romero Barceló;* 78–1698, *Caballero v. Cruz de Batista;* 78–1912, *Ramirez v. Cruz de Batista;* 78–2138, *Santana v. Cruz de Batista;* 78–2204, *Medina Vázquez v. Cruz de Batista;* 79–4, *Morales v. Parole Board of P.R.;* 79–688, *Figueroa Lugo v. Romero Barceló;* 79–1025, *Santiago v. Cruz de Batista;* 79–1112, *Inmates Bayamón Regional Inst. v. Cruz de Batista;* 79–1128, *Cintrón Ramos v. Cruz de Batista;* 79–1234, *Natal Rosario v. Romero Barceló;* 79–1673, *Esteves v. Romero Barceló;* 79–1705, *Chacón v. Romero Barceló;* 79–1706, *Cintrón v. Romero Barceló;* 79–1707, *Román Vega v. Romero Barceló;* 79–1708, *Villalobos v. Romero Barceló;* 79–1709, *Vega v. Romero Barceló;* 79–1710, *Soto v. Romero Barceló;* 79–1712, *Vargas v. Romero Barceló;* 79–1713, *Badillo v. Romero Barceló;* 79–1714, *Sanabria v. Romero Barceló;* 79–1715, *López v. Romero Barceló;* 79–1716, *Pérez v. Romero Barceló;* 79–1717, *Troche v. Romero Barceló;* 79–1718, *Ramos v. Romero Barceló;* 79–1719, *Colón Marrero v. Romero Barceló;* 79–1720 *Velázquez v. Romero Barceló;* 79–2069, *Agostini v. Cruz de Batista;* 79–2470, *Martino v. Maldonado;* 79–2505, *Cruz v. Romero Barceló;* 79–2514, *Rivera v. Parole Commission;* 79–2527, *Arce. v. Romero Barceló;* 79–2623, *González v. Cruz de Batista;* 79–2710, *Acosta v. Romero Barceló;* 79–2874, *Vega v. Vélez;* 80–256, *Natal v. Cruz de Batista;* 80–269, *Natal v. Cruz de Batista;* 80–274, *Cotto v. Romero Barceló;* 80–378, *Rodriguez v. Romero Barceló;* 80–380, *Wilson v. Cruz de Batista;* 80–417, *Nuñez v. Romero Barceló;* 80–418, *Diaz v. Romero Barceló;* 80–420, *González v. Romero Barceló;* 80–969, *Diaz v. Cruz de Batista;* 80–1125, *Matias v. Romero Barceló;* 80–1860, *Román v. Romero Barceló;* 80–1861, *Ríos v. Romero Barceló;* 80–2286, *Gordon v. Romero;* 80–2500, *Santiago v. Cruz de Batista;* 81–138, *López v. Romero Barceló;* 81–423, In re: *Arriaga Salamán, Freddy;* 81–428, *Alméstica v. Cruz;* 81–788, *Hernández v. Warden of State Pen.;* 81–1908, *Medina Vázquez, Enrique;* 82–1457, *Rivera v. Jiménez;* 83–1104, *Muñiz v. Pérez;* 84–182, *Acosta Ramos v. Corrections Administration;* 83–3145, *William Rivera Rivera v. Collazo;* 83–2372, *Nazario Ortiz Alvarado v. Rodriquez Fortier;* 84–1154, *Miguel Castro Nieves v. Zulma Rosario;* 84–1808, In Re: *Inmates of State Pen. v. Jorge Collazo;* 85–1730, In Re: *Inmates at Ponce Dist. Jail.*

**2.** The preliminary injunction Opinion and Order entered in this action appears at 497 F.Supp. 14 (P.R.1980).

tise of prison administrators and to the right of the Commonwealth of Puerto Rico to define and punish crime. The Court is also aware, however, of its duty to protect federal rights and enforce the Constitution of the United States within this jurisdiction, even behind the prison walls.

The Court's experience in the implementation of the preliminary injunction entered in this action five years ago has been an education in the peculiar needs and the problems confronted by the Commonwealth and the Administration of Correction in the field of penology. The Court has given careful consideration and given great weight in deciding this case to those needs and to the difficulties which even well intentioned administrators acting in good faith meet within the performance of their duties. The Court must regretably find, however, that the defendants have all too frequently offered the appearance of compliance with its decree as a substitute for obedience, the laws of the Commonwealth have been ignored by administrators (at all levels) who disobey in silence, and vast sums of money, whose expenditure has been repeatedly proffered to the Court as evidence of reformation, have been wasted without bringing about any substantial and enduring change in the reality of daily life in Puerto Rico's prisons. What little has been done, the Court finds, is only the result of the Court's prior intervention, and the fragile and limited improvements in the provision of medical services have been made in spite of the Administration and not because of any institutional determination calculated to turn around an agency which systematically inflicts cruel and unusual punishment on the persons whom the law has committed to its custody.

Nothing in this record even hints at the inability of the Commonwealth to comply with the commands of the Constitution. What is clear to anyone who cares to give even cursory attention to the evidence before the Court is that the intolerable cruelty of the conditions forced on the plaintiff class is caused by the intentional acts and omissions, or the deliberate disregard of the natural consequences of the acts and omissions, of the defendants and their agents and employees. This has been true for decades: the problems which the Administration faces have been a long time in the making. But every person now before the Court has acted or omitted to act to perpetuate the systematic violation of plaintiff's federal rights. The Constitution and laws of the Commonwealth of Puerto Rico, if obeyed, would have been sufficient protection against the evils prevalent in the institutions operated by the Administration. In the exercise of our equitable jurisdiction we do not, as we must not, rely on Commonwealth law to shape injunctive relief. But we take the law of the Commonwealth as evidence of the longstanding policy to maintain humane conditions in penal institutions, evidence to which we must give greater credence than to the protestations made by defendants' counsel unsupported as they are by any meaningful evidence.

This action was commenced by a complaint filed on February 7, 1979, and certified as a class action on April 2, 1979. After extensive discovery, bitterly contested by the defendants, a motion for emergency and extraordinary relief resulted in a preliminary injunction. The parties stipulated that the Court determine the equitable claims without precluding the rights of the parties to a trial by jury on the claims for damages, and the Court approved that stipulation.[3] The record now

---

**3.** As part of its power to afford complete relief the Court in addition to an injunction may award damages in the same action. *Restatement of Torts,* 2nd ed. § 951 at 626. *Local 391 Intern. Broth. of Teamsters, etc. v. City of Rocky Mount,* 672 F.2d 376 (4th Cir.1982); *Tritron Intern. v. Velto,* 525 F.2d 432, 438 (9th Cir.1975); *Rolax v. Atlantic Coast Line R. Co.,* 186 F.2d 473, 480 (4th Cir.1951). In the instant case findings of fact made prior to the issuance of a permanent injunction do not preclude plaintiffs to present proof before the jury on the damages issue. Here, no "interim relief or events have completely and irrevocably erradicated the effects of the alleged violation." *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979). The failure of one seeking an injunction to prove the amount of his damages until after his right to recover damages. *Tide–Water Pipe Co. v. Bell,* 280 Pa. 104, 124 A. 351 (March 24, 1924).

before the Court was completed in hearings which extended over months and it is a thorough and accurate evidentiary basis on which to predicate an understanding of the conditions in the penal institutions run by the Administration and the structures and *modus operandi* of the Administration. The transcript of the testimony given by dozens of witnesses (inmates, experts, Administration officers and employees, health professionals) runs into thousands of pages. The documentary evidence, no less extensive, includes films and still pictures, Administration and prison records, inmate files and medical charts, reports prepared for or by the Administration. The Court has conducted an ocular inspection of most of the closed institutions operated by the Administration. Counsel have thoroughly and repeatedly briefed the issues before the Court. This has not been an easy process. The defendants have fought the plaintiffs' every step of the way frequently beyond the limits of responsible litigation. The Court encourages, indeed requires, forceful advocacy in the representation of any client, but the defendants and their attorneys have insisted on an adversary of extreme vexatiousness which has sorely tested the patience of the Court and wasted judicial resources. It is not proper in a civil action to litigate protractedly factual matters which a party knows to be true beyond any reasonable doubt. This the defendants have done throughout the course of these proceedings.

The Administration is an integral system which operates all institutions within the Commonwealth where pretrial detainees are held pending trial and convicts are housed to extinguish their sentences. Its operations are highly centralized at its main offices in San Juan. The institutions are of three kinds: closed institutions, agricultural camps, and halfway houses. The closed institutions are at San Juan, Río Piedras, Bayamón, Arecibo, Aguadilla, Ponce, Guayama, and Humacao. The institutions known as The Industrial School for Women at Vega Alta and the Miramar Annex (which houses most but not all of the minors in the custody of the Administration) are also closed institutions. The State Penitentiary at Río Piedras includes a maximum security unit known by various names, but usually refered to by a euphemism as the U.T.I. or Intensive Treatment Unit. Bayamón and Guayama are recently built structures in a state of accelerated dilapidation which results from overcrowding and inadequate maintenance. Ponce and Aguadilla are nineteenth century structures. The rest are of intermediate age. All, particularly Arecibo, Aguadilla, Ponce and the Miramar Annex, which are both dangerous and unfit for human occupation, are badly dilapidated. During the pendency of this action millions were spent on the modernization of the State Penitentiary: a riot caused extensive damages which had not yet been repaired months later at the time of our ocular inspection. The status of the institution at Sabana Hoyos has changed during the course of this action from a camp to a closed institution.

The agricultural camps are underused and except intermittently and for short periods do not present the conditions of overcrowding which prevail in the closed institutions. These institutions are located at Sabana Hoyos, Mayaguez, Jayuya, Cayey, Río Grande and Naguabo. The halfway houses at Río Piedras, Arecibo and Carolina were only incidentally mentioned in litigation and their marginal function in the system makes them non-significant to our findings and conclusions.

Every penal institution has its own superintendent, who is responsible for the day-to-day management of the institution. A division within the Administration hierarchy, known as the Program for Penal Institutions, supervises and oversees the operation of all the penal institutions at the central office level. The director of the program is directly responsible to the Administrator and sub-Administrator of Correction.

Every year the Administration submits a budget request necessary to cover its operations and projected expenditures for the coming fiscal year. This budget request is made to form a part of the general expenditures budget for the Government of Puerto

Rico that is submitted to the Legislature of Puerto Rico by the Governor. In the preparation of the Administration's budget, each of the penal institutions submits a budget for its operations. That includes food, medicines, supplies, equipment and personnel.

The central offices asume the distribution of medicines, the transfer of inmates, the allocation and transfer of guards, social workers and medical services personnel, and supervisory responsibility of each institution's capability to deliver services to provide for the needs of the inmates such as health services, educational and vocational services, security to life and property, food and beding and general hygiene services.

The total penal population in Puerto Rico hovered around the 3,800 mark for the year 1981. This number has continued to increase during the pendency of this action. The inmate population is divided initially in two broad categories: pretrial detainees and sentenced inmates. Except for pretrial detainees, who are not classified in any way, inmates in the penal institutions in Puerto Rico are classified into three custodial categories: minimum, medium and maximum. Pretrial detainees are normally kept in the closed institutions. There they account from anywhere between 20% to 50% of the total penal population of the institution at any given time. In most institutions, pretrial detainees are indiscriminately mixed with sentenced inmates. Only minimum custody classification inmates can be placed at the penal camps. Additionally, only minimum custody classification inmates are allowed to work with the Correctional Enterprises Corporation.

The number of inmates that are confined in any given institution is theoretically determined by capacity ratings which have been assigned to each institution by the central office. Daily reports on the penal population of each institution are sent to the central office. The Court has been unable to find any rational criteria for the capacity ratings originally assigned by the Administration to the several institutions.[4]

4. The constraints and insensibility under which field personnel work are illustrated by the following exchanges which took place during the examination of a superintendent at the Ponce institution.

BY MR. FERNANDEZ:

Q. Sir, in the dormitory you have identified as sumaria or pre-trial Roman Numeral number I, lower level, do you know how much space is available per inmate?

A. I do not know.

Q. Do you know how much space is available for any inmate at any of the dormitories at Ponce, taking any dormitory at Ponce. Do you know that?

A. As I said before, I am not the one who determines the space.

Q. Do you as superintendent of the Ponce District Jail, are there any factors or elements to you as superintendent that are important in order for you to determine how many inmates you might, you may put at a given dormitory, for example?

A. Well, as a reasonable space.

Q. And how, what is a reasonable space to you, how much,

A. I don't know. Maybe it could be a space being enough for two people to pass through at the same time. One person, ten feet of distance. I don't know. It depends.

THE COURT: Sustained. What standard do you apply or are you given any standard to apply to determine the capacity of a given penal institution?

THE WITNESS: Well, the jails, let us say in a modern jail such as the UTI, Bayamón and the State Penitentiary, they have a given capacity, they have a fixed, a certian number of cells. But as regards the Ponce District Jail, I do not know what is its capacity.

BY MR. FERNANDEZ:

Q. You do not know its capacity, is that your answer?

A. Exactly. I don't know what the amount or what the capacity for that jail is.

Q. Let us say that you have a dormitory that has two toilets, two available toilets, how many inmates, do you have any idea as to how many number of maximum number of inmates could you put in there in terms of those sanitary facilities?

A. Ten persons. I don't know.

Q. Sir, before showing you those documents, sir, how many toilets are there in the dormitory, in the dormitories which you have identified as Roman Numeral II, lower level, where the young adults are kept?

A. One toilet.

Q. How many shower stalls are there in there?

A. One faucet. One. I am not sure.

Q. How many wash basins?

A. I don't know if there is any.

Q. May I have it. Sir, I know that upon my questioning you stated that you don't know what the capacity at the Ponce District Jail is. Does this mean that, for example, if tomorrow you get 20 new inmates you just take them in?

## Overcrowding

Overcrowding is at the center of the many ills which make the conditions of imprisonment in the Commonwealth's penal institutions constitutionally unacceptable. Neither statistics nor anecdote will suffice to express the intensity of confinement, physical and psychological, to which the plaintiff class is condemned. Medical and social services cannot be rationally planned or systematically delivered in institutions filled beyond capacity to such an extent that at times inmates will cover the entire floor space in their living quarters when they lie down to sleep on the floors—with or without mattresses—and in double bunks ranged so closely together that they must be entered from the front rather than the side. Recreation, exercise and education, even where the facilities exist to provide them, are available only to a small fraction of the population. But all of these services and necessities are luxuries to these plaintiffs whose property and lives cannot be protected by the Administration.

The overcrowding evidenced by the testimony of the superintendents, the films and photographs are hard to believe even when experienced. As the Court visited each institution the sense of physical closeness and the revulsion at so much compressed humanity grew to an awareness of the psychological stress which must affect any human being almost totally deprived of any privacy or intimacy. Towels and sheets have turned bunks into cubicles of isolation in spite of the Administration's prohibition of these make-shift partitions which increase security problems by reducing custodial visibility within the dormitories. Some few inmates, by the use of unapparent authority and power, have appropriated disproportionate amounts of space; in the newer institutions spaces meant to be linen and utilities closets have become the privileged domain of one or two inmates. Otherwise, the inmate population lives in oppressive physical propinquity in communal housing units in the tropical heat, with inadequate ventilation and not infrequently unprotected against the rain.

Unprotected, convicts and pretrial detainees are housed together, most of them in total idleness, without regard to even the availability of sanitary facilities. At the remodelled State Penitentiary the Court saw a group of over sixty men housed in two large rooms whose only furniture was the thin plastic mattresses on which they slept: all sixty had access to two toilets, one of which was out of order, and both of them were beyond two locked gates manually operated by a guard who, as part of his duties, allowed one inmate at a time access to the single sanitary facility. Other institutions operate on the same standard of callous indifference to even the basic physical needs of inmates. The rated capacities assigned to each institution by

A. I have to accept them because it is an order of the court.
Q. How if you get 100 new inmates?
A. I have to accept them.
THE COURT: Isn't it a fact, Mr. Castellar, that based on your nine vast years of experience as a custodian officer, based on your Bachelor of Arts with a concentration in sociology where you studied penal institutions, that neither the Corrections Department nor the Department of Health or anybody have to tell you when a jail is overcrowded or overpopulated and that you know that from your own experience, don't you?
THE WITNESS: Well, it's just that in jails there are areas where a group of inmates is greater than other areas.
THE COURT: So there are areas of the jail that are overpopulated and overcrowded and others are not?
THE WITNESS: It's just that I do not know what the capacity of the jail is to me to be able to tell when a jail is overcrowded or when it isn't.
THE COURT: You have now as of Friday 394 inmates. That is the number. You had 394 inmates as of last Friday, more or less, is that correct?
THE WITNESS: Up till yesterday.
THE COURT: So if all of a sudden you get 600 more prisoners in your jail in Ponce, would you still say that you do not know if your jail is overcrowded or not?
THE WITNESS: Well, they're spaced to house 600 persons more at Ponce.
THE COURT: Where, in the Holiday Inn?
THE WITNESS: No, in the visiting rooms and there is more space there.
(At 35 square feet per inmate Ponce has a total capacity of 236 inmates. By recognized correctional standards that capacity would be reduced to 99 inmates.)

the Administration are more a declaration of intent than anything else and there is no rational basis for the capacity assigned except in Bayamón and Guayama, which were recently constructed and designed to house a specific number of prisoners.

Bayamón was designed for a population of 450–500 inmates, the population has at times reached over 1,400; Guayama, which should have no more than 220 has been doubled. We quote from the evaluation of the Administration prepared by Moyer Associates Incorporated, at the Administration's request, titled *Plan for Corrections: Commonwealth of Puerto Rico,* filed on September 12, 1984, (Moyer Report), the descriptive summary of housing conditions at Bayamón:

> Unacceptable. There are two types of housing at this site, maximum security single cells provide housing for approximately 184 inmates. The remainder of the housing is for all minimum security custody. Both housing types require complete building rennovations, hardware maintenance or replacement and new equipment. Also inmate counts should be determined for each housing unit and not exceeded.

The comment on this institution is in part to the effect that:

> While this is a very new and reasonably good institution for 450–500 inmates as it was originally designed, the over population to inmate levels of 1,400 inmates have resulted in an almost total vandalism of the entire physical plant. The entire facility requires a major renovation and all new equipment.

The housing at Guayama was also rated unacceptable and although the population levels have not been there as dramatically over capacity as at Bayamón, overcrowding is still the assignable issue for the deficiencies in housing, caused by vandalism to be sure, but also by the poor maintenance given all facilities and the Administration's abdication of its duty to maintain order within all institutions.

The National Institute of Corrections (NIC) Report also describes the institution at Bayamón. As far as it is a description of the conditions of life and the environment in which the inmates live it is in agreement with the evidence before the Court. We quote *in extenso* with the *coreat,* here as elsewhere, that the recommendations made by the Report have been weighed by the Court in reaching the decision which we set out below, but that we have also taken care to limit the remedy which we grant to the plaintiffs to what is constitutionally required and not what is expertly desired. At pages 27–29 the Report reads:

> a. *Metropolitan Regional Institution/Bayamón.* The original design of this facility, which began in 1968, and for which construction was completed in 1976, compares very favorably with the features called for by current standards for correctional facilities. The design designated a range of program and administrative spaces that would accommodate educational, counseling, recreational and other client activities. *Today extreme overcrowding has caused these spaces, and others, to be redesignated as sleeping areas for additional inmates.*
>
> An additional result of the overcrowding has been the rapid deterioration of the relatively new physical plant. In part this appears to have been caused by the overloading of building systems which were designed for a much smaller number of inmates. *In greater part it seems due to other impacts stemming from overcrowding, most particularly the institutional atmosphere that has developed. The prevailing situation is one in which inmates are in much greater control than staff over events that occur. Increased tensions and hostilities tend to become expressed through attacks upon the institution itself. Deliberate abuse and vandalism of the buildings is prevalent, some intended to achieve personal environments and individual expression in a place where there is no recognition of the individual.*
>
> The same results could occur, and sometimes do occur, without overcrowding—e.g., where minor repairs are neglected

and thereby lead to major structural or functional problems. *An unsatisfactory institutional climate, however, is exacerbated by overcrowding, though it will not be remedied by a reduction in the number of inmates alone nor explained by suggestion that the architect has produced a faulty design.*

*The condition which exists at Bayamón, in addition to its outward display of deterioration, is an extremely unsafe one for staff and inmates alike.* Recommendations are separately offered concerning classification, programming and administrative measures relative to this condition. With respect to the physical environment, the following is offered. *Population should be reduced to allow originally designated classrooms, corridors, and other spaces to be returned to their intended use.*

Dependent upon the classification of inmates who might be assigned to Bayamón, several alternatives are suggested that would allow compliance with the recognized standards in the field. In terms of the specific requirements of the preliminary Opinion and Order issued by the United States District Court, the requirements are quite clear. Population must be reduced to achieve 35 square feet of living and sleeping space within the specified time requirement, and later, 55 square feet. In the case of Bayamón it is found that a total capacity of 568 inmates is possible under the first condition. A systemwide plan which achieves 55 square feet per inmate in dormitories and single occupancy of cells (which at Bayamón are approximately 60 square feet in size) allows a total capacity of 416 inmates.

Under the latter condition of occupancy, considering dormitories as minimum security space, Bayamón would offer 304 minimum security beds and 112 medium or maximum security individual cells. These cells are unaccompanied by dayroom space required by recognized standards. Consequently the total capacity of 416 inmates at 55 square feet per inmate is qualified.

The further consideration of necessary amounts of day space to accompany the dormitory sleeping areas, in accordance with standards, produces a capacity finding of 268 inmates in these areas. Coupled with the 112 individual cells, the total capacity is 380 inmates on this basis.

(emphasis added)

The Ponce institution was built between 1830 and 1849 and is functionally obsolete as well as in a serious state of structural deterioration. Constructed as a barracks made of timber, frame and brick (the administrative area is a warren of cardboard and plastic partitions) structural cracking is evident at several locations on the outside wall. The dormitories are obviously unsafe for inmates and staff—a condition from which the guards and their supervisors try to protect themselves by never entering the dormitories alone and carrying out routine supervisory duties from outside the dormitories.

About the Arecibo institution the NIC has this to say at page 32:

Constructed in 1905, it possesses the degree of functional obsolescence that can be expected of a facility of this vintage. All building sub-systems are substandard, including the structure itself. Roof and floor structure consists of timber beams on masonry bearing walls with wood purlins supporting a brick and concrete deck (see Figures 47, 48 and 54). In some areas the bricks have fallen out. In other areas, an insect infestation is eating away the wood support members and tracking their wastes all over the walls. [Figure 48 documents this condition in the commissary.] Facilities in less serious condition have been condemned for public use.

And about the District Jail at Humacao:

It is a fire trap; it is unsanitary, overcrowded, and generally unfit for human occupancy. Paint is falling off the ceiling into the food preparation area. Food spillage is everywhere. Tiles are missing from the walls. Vermin infest the inmate lockers and living areas. Water damage is evident throughout. Electri-

cal wiring is outdated and unsafe. Locking devices present a life safety hazard. Clothing hangs everywhere. Mattresses are torn and dirty. Because there are more inmates than beds, many sleep on mattresses placed on the floor. Rats also occupy the floor.

The capacity ratings presented in this report address area allowances only. The continued use of the Humacao District Jail, even at these levels should be considered only on a temporary basis. *Facilities in less serious condition and posing less danger to their occupants have been ordered closed in other jurisdictions. Humacao, like Ponce, Arecibo and Aguadilla, should be considered no differently.*

The jail at Aguadilla is exceptionally sound in structure, which advantage is offset by there being no grounds: an 848 square foot courtyard surrounded by the three story building and a blank wall is the only space for recreation. The courtyard is used for dispensing meals to inmates and for cleaning cooking utensils after use: all other uses are therefore limited to the late afternoon hours. Visits are conducted in the dining room, as they are conducted at Arecibo in the entrance hall. Kitchen equipment, electrical systems, plumbing and locks are substandard and patently dilapidated. This institution is particularly dark, damp and ill-ventilated.

The Miramar Annex, used to house young adults (almost exclusively since adult inmates who work there are also housed in the institution) is particularly shocking. Built as a hospital, the structure is totally inadequate to a penal purpose. It is deteriorated beyond redemption: the kitchen is unsanitary, open drains and open sewers, malfunctioning and insufficient toilets and drains, insufficient ventilation, bad illumination, inadequate recreational and educational facilities, heat and intolerable levels of noise characterize this hellhole where youth is expected to rehabilitate itself or wait for the judgment of society.

What is remarkable about the conditions which we have set out here is that they are evident: the films and pictures in evidence, a visit to the institutions, a layman's knowledge are enough to establish what we have described. The defendants knew that such was the reality which they so strenuously fought to keep from the record; they just plainly could not have not known. They have received the expert and documented advice of highly qualified professionals. Nothing has been done except at the command of the Court and that grudgingly and incompletely.

Let us for the sake of illustration tabulate the numerical capacities of these institutions at different intensities of occupation and compare them to the by now exceeded, recent levels of overcrowding.

To deal with this level of overcrowding policy decisions must be made and line personnel must be trained to carry them out and all employee and staff persons must be aware of the complexity of the issues, the magnitude of the effort to be made and the

| Capacity at 35 square feet per inmate | | | | |
| Total Capacity | Actual Occupancy 12/31/80 | Beyond Capacity | Actual Occupancy 7/21/83 | Beyond Capacity |
|---|---|---|---|---|
| Bayamón | 568 | 1242 | 674 | 916 | 348 |
| Guayama | 220 | 410 | 190 | 2449 | 229 |
| State Pen | 507 | 310 | (197) | 943 | 436 |
| Aguadilla | 80 | 188 | 108 | 112 | 32 |
| Stop 8 | 66 | 56 | (10) | 74 | 12 |
| Humacao | 73 | 177 | 104 | 179 | 106 |
| Vega Alta | 94 | 74 | (20) | 141 | 47 |
| Arecibo | 109 | 215 | 106 | 125 | 16 |
| Miramar | 183 | 250 | 67 | 358 | 175 |
| Ponce | 236 | 325 | 89 | 499 | 263 |

| | Total Capacity | Under Professionally Recognized Standards | | | |
|---|---|---|---|---|---|
| | Total Capacity | Actual Occupancy 12/31/80 | Beyond Capacity | Actual Occupancy 7/21/83 | Beyond Capacity |
| Bayamón | 380 | 1242 | 902 | 916 | 536 |
| Guayama | 116 | 410 | 294 | 449 | 333 |
| State Pen | 500 | 310 | (190) | 943 | 443 |
| Aguadilla | 36 | 188 | 152 | 112 | 116 |
| Stop 8 | 25 | 56 | 31 | 74 | 49 |
| Humacao | 41 | 177 | 136 | 139 | 98 |
| Vega Alta | 62 | 74 | 12 | 141 | 79 |
| Arecibo | 52 | 215 | 163 | 125 | 73 |
| Miramar | 55 | 250 | 195 | 358 | 303 |
| Ponce | 99 | 325 | 226 | 499 | 400 |

need to abide by decisions and perform duties. Overcrowding will not be solved immediately and it affects every area of inmate life. But overcrowding must be dealt with and other problems resolved if the prisons of Puerto Rico are ever to pass constitutional muster. We again quote from the National Instutite of Corrections Report, at pages 26–27, to show the interrelation of the several areas and the magnitude of the problems to be addressed by the Court, the parties and, ultimately, the Commonwealth of Puerto Rico.

The recently constructed facilities at Bayamón and Guayama have deteriorated quite rapidly with overcrowding as one of the principal reasons. The older district jail facilities, including Humacao, Ponce, Arecibo and Aguadilla, are severely deteriorated for different reasons, although they are also extremely overcrowded. These older facilities are obsolete in their original design. They are uniformly characterized by violations of recognized health standards, life safety codes and building codes. They are substandard structures which, at the same time, fail to provide appropriate space in either quantity or quality for detention or corrections use.

As a matter of introduction to the material that follows, the question of requirements for pretrial as opposed to sentenced inmates needs to be addressed. As it affects facility conditions, such a distinction generally only involves the provision of intake processing spaces for pretrial use—which are not required in sentenced facilities—and the provision of additional program spaces in sentenced facilities beyond basic recreation, counseling or interviewing spaces which any facility should have. Recognized standards, as well as the results of cases filed under the equal protection provisions of the 14th Amendment to the United States Constitution, establish that inmates who are not yet adjudicated should be provided no lesser level of safety or adequacy in housing condition than those who have been tried and found guilty. As a result, necessary housing, programming and support requirements are not significantly different for pretrial and sentenced individuals. Further, the type of housing, whether individual cell or dormitory, will be tied to classification in either instance.

The foregoing statement has particularly significance for the Puerto Rican corrections system. The shortcomings of the various existing facilities will not be remedied by redesignating them as pretrial facilities. It is observed that existing facilities primarily offer open dormitory sleeping and living space. Despite a certain amount of cell space in the system (728), none is accompanied by necessary day space. The dormitories are generally appropriate for inmates classified as minimum security only. Consequently, the representation of system capacity which follows is qualified and should be correlated to the results of a classification analysis of the total system

population. Also, it should be correlated to the results that would be obtained by diverting socio-medical and psychiatric cases from the corrections system to more appropriate resources.

Adequacy of existing facilities will not be obtained by a reduction in population alone. Were this possible, the charts presented in this section of the report indicate the need for a very significant reduction in population, the development of additional bedspace, or a combination of these. Compliance with the preliminary Opinion and Order of the United States District Court, dated September 5, 1980, at the levels of 35 square feet and 55 square feet of sleeping and living space per inmate points directly to such a need. While every facility has not been analyzed under this technical assistance, the major facilities and some camps have been. By extending the findings in most institutions to those remaining, it is possible to approximate the implications of compliance with the court order. This is done by comparing the existing total incarcerated population to that which is possible under the stipulated floor area allowances. Setting aside the issue of type of population, whether minimum, medium, or maximum security, it is found that the total existing institutional capacity is approximately 3187 inmates at 35 square feet, and 2332 inmates at 55 square feet. Compared to an existing population of approximately 3948 inmates, current utilization of facilities is excessive in the amount of 761 and 1616 inmates respectively.

It should be noted that we are cognizant of the U.S. District Court's mandate requiring, at a time in the future, 70 square feet per individually-celled inmate. Currently, the corrections system does not have cells that meet this requirement, although almost all are within ten to fifteen square feet of the required size. Professional standards suggest 60 square feet as adequate where time-in-cell is limited. In order to accommodate such standards, considerable day space would have to be created and increased emphasis placed on productive activity and programming. Without such arrangement, it would be necessary to construct new cells. In this regard, compliance with the court order requires a similar analysis of options. However, for purposes of the assessment of capacity as described in the remainder of this section, we have assumed continued use of those cells currently available. The Administration should keep this caveat in mind when preparing its report to the District Court.

Considering the matter of type of bedspace and the recognition of established standards in the field, it is found that the system has a total of 1069 minimum security beds and 721 medium and maximum security beds. Under this analysis, which is qualified to include certain improvements in existing facilities, the system has a total bedspace capacity of 1790. Particular reference is made to the Federal Standards for Prisons and Jails adopted by the U.S. Department of Justice and the Manual of Standards for Adult Correctional Institutions issued by the Commission on Accreditation for Corrections of the American Correctional Association. While compliance with these standards has not been mandated under the preliminary Opinion and Order, it has been considered as potentially useful to assess the capacity of the institutions in the system under these standards as a reference point when considering interim or short-term actions. Beyond this approximated assessment of capacity, it is recommended that a more detailed follow-up analysis be undertaken. The study should be a part of a planning focus for the total system in which facility requirements are determined by decision-making in the larger context. The amount of bedspace and kind of bedspace are inextricably tied to a range of system options that may be considered and acted upon. Each of these needs to be analyzed both for the immediate impact and that which may be projected. Such option—affecting routing of clients in or out of the system, classification and programming for individuals incarcerated, and lengths of client stay—should be

compared against a profiling of the inmate population to determine the extent of their potential impact, and referenced to the values of the public in Puerto Rico to discern the extent of their acceptability.

The overcrowding which pervades the system cannot be corrected by a uniform assignment of square feet per inmate. Nor can we rely on the standards preferred by expert opinions and professional associations. The life in these institutions is in such a state of disarray and the incapacity of the Administration to manage the system is so evident, that we can only take square footage and recommended standards as our point of departure. As improvement is shown in other areas of penal life we will have to reconsider and modify our decision of today. Let us now examine those other areas.

### Security

An inmate's protection against inmate violence may often depend on how fast he can run to a locked gate to call a guard. Violence takes the form of sexual assaults, mayhem or homicide, all of which occur with intolerable frequency throughout the system. Firearms and explosives have been used during riots which have produced several fatalities. Suicides are frequent. Assaults by guards on inmates are frequently reported. Guards frequently look the other way or incite other guards or inmates when violence occurs. There is a widespread insecurity and universal fear throughout the system.

Gangs form and reform themselves around shifting loyalties. The Administration has admitted what was patently evident during our visit that institutions have in recent years been dedicated to one of two island-wide gangs who are the effective government of prison life, and no person who belongs to whichever is the other group is safe within an institution held by either gang. At Bayamón the guards were observed to be outside the individual buildings which house the communal dorms: the fact of gang control is accepted everywhere and by all.

The ratio of guards to inmates is, on paper, well within the 1:5 proportion prevalent throughout the nation. Absenteeism and sick leave modify substantially that sufficiency of guards, pay and morale are low, training is deficient. And the effective use of guards is further diminished by the need to assign them to non-custodial tasks. Almost every superintendent who testified or was heard during the inspection of the closed institutions asserted that he needed more guards to assure inmates of their personal security: requests that were routinely ignored by the central office. A staffing pattern recommended by the National Institute of Corrections, at the Administration's request, could not be met. Guards are routinely not deployed within overcrowded dormitories: as we have noted they are at times not even deployed within buildings at the posts expressly designed for this function.

Locks are of unacceptable standard throughout the institutions and security equipment is equally deficient: padlocks, with individual keys, and chains have been substituted for standard locking systems. This condition presents life safety problems as does the absence of devices to detect and suppress fires.

What has been said here is only a brief and concentrated extract of the evidence spread on the record and we will not make the crisis worse by detailing here the risks inherent to the system, but the record will uphold the Court's conclusion that the Administration does not afford inmates or staff protection against violence and that the plaintiff class lives in fear. The moral degradation of a law enforcement agency which yields its authority over persons in its custody to gangs of convicts can only work to the deterioration of inmates and force them to accept extra-legal structures of life and government.

### Protective Custody

Considering the Administration's failure to protect plaintiffs from violence, it is not surprising that large numbers of inmates request to be placed in protective custody. To do so they must execute a waiver since

protective custody is frequently only available in isolation cells—before the preliminary injunction in the infamous "calabozos". Once isolated in a hospital ward, maximum security cell or other isolated space the inmate is given no further particularized attention. Pre-trial detainees must often place themselves in protective custody because unfamiliarity with prison life makes them vulnerable, because the prison in the locality of arrest is in control of an enemy gang, or because the young must be protected against sexual assault.

Although it is not the Administration's policy to change the classification of an inmate placed in protective custody, it does occur. The practical effect of living in protective custody, however, is that the inmate forfeits his participation in work, study and recreational programs and the time-credits which go with work and study. (See Tr. 1466–68). One Administrator, Irba Cruz de Batista, was under the unaccountable impression that special tutoring was provided for persons in protective custody. The Court must reiterate that the low credibility which it assigns to Administration witnesses is at least in some part due to the bizarre beliefs and impressions to which they testified.

Considered with the deplorable conditions in the institutions and the fact that protective custody means mostly a 24–hour lock-up (with perhaps a walk down the hall for a shower once a day), the extended time for which an inmate must stay in protective custody (often months on end) and the absence of medical supervision of any kind, the Court finds that protective custody wantonly inflicts on inmates considerable pain and deprives them of opportunities to shorten their time of incarceration. The waivers, executed in fear of sexual assault, violence or death, are nullities.

### Disciplinary Proceedings

Regulations on disciplinary proceedings were promulgated by the Commonwealth as a result of prior litigation in this Court: *Milton Sandoval, et al v. Francisco de Jesús Schuck, et al,* Civil No. 939–75. On paper, the regulations pass muster. But the operation of the disciplinary process causes delay and is frequently used arbitrarily and capriciously by custodial and administrative personnel.

Once the inmate is charged with a violation of prison regulations he is placed in the same living conditions as those discussed above for inmates in protective custody—with the same results. An inmate who wins his case after waiting for a hearing and a decision after a hearing will have been punished without any cause.

### Classification

There is neither a rational nor adequate classification system in the Administration of Correction. Pretrial detainees are regularly housed with convicted prisoners. First offenders are not separated from recidivists. Dangerous and aggressive inmates are housed with passive individuals. Misdemeanants are not separated from felons. There are three custodial classifications for convicted prisoners: maximum, medium and minimum. Classification of a prisoner after conviction is made by a Classification and Treatment Committee in the closed institution to which he is assigned. Before being seen by the Classification and Treatment Committee, the convicted prisoner must be interviewed and recommended by the socio-penal worker.

The Classification and Treatment Committee is, within each institution, the operational administrative unit in charge of classification. Classification and Treatment Committees are composed of the superintendent of the institution, a custodial officer and the socio-penal worker. Automatically, upon entry, the convict is classified in the medium custody unless same reason appears for a maximum classification. There is no entry point or entry points where inmates are sent after conviction for a full physical and psychological evaluation, coupled with a detailed analysis of their criminal record and past custodial behavior. The Classification and Treatment Committee does not have the authority to transfer the convict to any other institution. Pretrial detainees are not classified: indeed, they rarely, if ever, receive any

social services and are mostly left to their individual or family resources to establish communications with the outside world to secure the assistance of counsel, arrange bail and prepare for trial.

Inmates may remain unclassified for long periods of time. At all times prior to the consolidated hearing in this case the number of socio-penal workers in the several institutions had never reached more than 75% of the positions allocated, and for some periods of time there were only about 60% of the positions filled. Months could go by, as happened for example at Arecibo, with no socio-penal worker at all. Nearly every socio-penal worker has a case load that is unmanageable.

This underutilization of allocated resources continued through the hearings on various contempt motions and was apparent during the inspection by the Court. It must be remembered that referrals to the CTC are one of the many duties of these underpaid and sometimes unqualified employees.

All the evidence shows that the Classification and Treatment Committees invariably decide by unanimous vote and there are hardly ever any discussions or dissents spread upon the minutes. Upon classification, the inmate is given an institutional plan. The institutional plan generally has nothing to do with the inmate's custodial classification, his propensities and talents, or his former work experience, if any. Institutional plans are determined by the size of the population in the particular institution, the services available there, the jobs open and the number of penal guards available.

Once classified as a medium custody prisoner, there are no regular periods for re-evaluation of that classification. Except for a proposition in the Manual of Classification that convicts should be observed for eight months before classification from medium to minimum custody, re-classification is not geared to the length of sentence, the type of crime committed, or other rational criteria. When re-classification is made, the result is noted but reasons are seldom, if ever, placed on the record.

As a result of the chaotic classification procedure, inmates who would benefit from anti-addiction treatment may be confined in institutions where such services are unavailable. Inmates who could be learning academic courses are confined in institutions where they are not offered. Nothing is done to assure the continuity of treatment or education when a transfer from one institution to another takes place.

The record is replete with instances of the institutional mixing of young adult offenders with mature persons; of first offenders with recidivists; of minimum custody prisoners with medium and maximum custody prisoners; of misdemeanants with felons; of addicts with non-addicts; of passive and aggressive individuals; of relatively normal persons with persons suffering from mental illnesses; of the sick and contagiously ill with the healthy. This failure of classification operates to prevent rehabilitation. It also militates against the personal security of the inmates and of the institutions themselves. The classification procedures or their malfunction adversely affect the convicts' liberty rights. Extra time credit for work or study do not depend upon an inmate's custodial classification as much as upon the fortuitous placement in one or another of the ten closed institutions. This may result in the anomalous situation where maximum custody prisoners are able to lower their sentences by working while minimum custody prisoners cannot. In essence, classification depends in great measure upon such determinants as proximity to the sentencing court and availability of beds, which are not the considerations on which the classification manual is elaborated. The implementation of the institutional life-plan will further depend on the availability of guards and the institution's safety levels since an inmate will often have to lock himself up in protective custody beyond the reach of work, study or therapy.

The Court concludes that proper classification is essential to the operation of orderly and safe institutions. Without proper classification of inmates, equal opportunity to prison work, to credits for lowering time

served, for therapy for addiction, and for educational opportunities, do not exist. The haphazard operations of classification and institutional life-plan of inmates further contributes to the confusion and frustration of their lives and to the deterioration of said lives and opportunities for rehabilitation.

Arbitrariness becomes the norm in granting or withholding services and programs which are the required means to earn time-credits or obtain parole. We do not here consider the effect of this chaos on any individual inmate. The Court does find, however, that systematic administrative malpractice and negligence engendered by a routine failure to comply with Commonwealth law and regulations produce the random denial of statutory rights and the reasonable and well-founded expectations of members of the plaintiff class without the due process of law secured to them by the Fifth and Fourteenth Amendments to the Constitution.

### Rehabilitation and Parole

#### A. Rehabilitation:

All the sociopenal workers, their supervisors and the superintendents asserted that rehabilitation of the convicted inmates is the most important goal of their work: rehabilitation is achieved through participation in institutional programs, successful adjustment to prison life and finally reintegration to the free community as a law-abiding citizen. Institutional programs, however, do not exist or are inadequate: when in operation they can be arbitrarily suspended for lack of materials or space, or because teachers or guards are unavailable. Program schedules are conflictive and inmates may have to drop out of one to participate in another. Educational courses are above or below the educational levels of the inmates. Work sources are few and the available work is not meaningful. Recreational facilities are either entirely lacking, underutilized or not used at all because of the unavailability of equipment, guards or other personnel. Inmates are not assessed or diagnosed for work or vocational training but made to fit the available slots: another inmate or a guard is frequently a better source of employment opportunities than the CTC, which is officially responsible for job assignments.

The agricultural camps are not an exception to the general inexistence or disarticulation of institutional programs and deterioration of facilities for recreation and education.

This situation places the mass of the population in custody in degrading idleness, shut up in overcrowded dormitories and cells during most of the day, day in, day out, for years on end. It deprives most inmates of their statutory right to reduce their terms of incarceration by obtaining good-time credits through work or education through the arbitrary capricious operation of individual whims or through the grossly negligent failure of the Administration's officers and employees who fail to comply with their duties under Commonwealth law to provide recreational and educational programs. The Administration's failure to maintain order and secure the personal safety of all persons in its custody is one of the most important factors in the deterioration of facilities, unstructured programs, the break-down of schedules. The resources are available but they are wasted by daily acts of negligence, the abdication of responsibility and the failure to supervise on the part of individual Administration officers and employees at all levels. Thus, we find unused playing fields, classrooms turned into dormitories, teaching funds withheld because of poor enrollment, classes suspended because of unavailable guards, failure to coordinate arrangements with other government agencies or the improper exercise of power by custodial personnel under the carefully averted eyes of their supervisors.

#### B. Parole:

The sociopenal workers are supposed to help the inmates in preparing their institutional life plans and their reintegration plans with a view to accumulate evidence that will show the Parole Board that their time in prison has been well spent and that

they will be able to reintegrate into the free community as law-abiding and working citizens. That the inmates cannot acquire the necessary evidence of educational or work experience in prison we have already seen. But sociopenal workers are further impeded in their duty by work overloads and inadequate resources. Caseloads are normally beyond the limit of all witnesses' estimate of reasonable and manageable number of cases per worker. But even a reduction would not provide the resources needed to prepare a reintegration plan which requires a verifiable offer of employment and approved place for residence. The sociopenal worker has no time or resources to check out the information obtained by the inmate through his family and friends and parole is frequently denied through mistakes that could have been corrected by the sociopenal worker if only the reintegration plan had been properly verified and evaluated.

But of greater adverse significance to the inmate's prospects for parole is the fact that the sociopenal workers do not have adequate information about the standards used by the Parole Board to grant or deny parole. They must rely on their own experience in prior cases which they have handled to guess at what information the Board wants, the weight given to the factors purportedly applied or the corrections needed to prepare a successful application. Even the testimony at trial of the Parole Board members conflicted on the applicable standards and the weight given to the factors considered in making a decision.

The Parole Board is independent from the Administration in discharging its obligation to grant or deny parole but is administratively integrated and the two agencies are interdependent in functional ways. In spite of prior litigation in this Court, there are frequent backlogs and delays because the Administration does not adequately perform its work of preparing cases for the Board which lacks personnel needed to work efficiently. Because it must rely on the Administration, the Board's fact finding is frequently wrong.

This administrative chaos militates actively against the plaintiffs' right to present their cases for parole to the Board and to have an adjudication of their claim according to Commonwealth statutes and regulations. And it contributes significantly to exacerbate the frustration of convicted inmates, to increase the level of tension in the penal population and to inculcate in each person's mind an image of irrationality in the processes of the law. The discrepancies between the realities of prison life and the requirements for parole, promoted as they are by the callous indiference or malfeasance of Administration officers and employees, deprive the plaintiff class of even their ability to exercise rights which implicate liberty interests without the due process of law guaranteed by the Constitution of the United States.[5]

### Drug Addiction

More than half of the total population in the Administration's custody have had some involvement with drugs.[6] Treatment against drug addiction is unevenly provided throughout the penal system by the Commonwealth of Puerto Rico's Anti-Addiction Services Department (hereinafter DSCA).[7] Additional services are provided by Hogares CREA, Inc., a private non-profit or-

---

**5.** Statutory right to expectancy of being heard by Parole Board: 4 L.P.R.A. §§ 1503 and 1504.

**6.** This estimate was provided by the Administrator. (Tr. 3656). There is no reliable information to even estimate the accuracy of this estimate. (See, Tr. 1672, 2449, 2790, 3269).

**7.** Although there seems to be a consensus that the duration of treatment should be from six months to one year, at least one therapist disagreed. Some therapists do not differentiate treatment measures to reflect the type or severi-

ty of addiction; others do. (Tr. 187, 562, 889, 897, 3260, 3272). There was no treatment at Camp Zarzal, and inmates there must either "waive" their right to treatment or face a transfer to a closed institution. (Tr. 3305–3307, 3397–3404). Inmates who have chosen to stay have been denied parole or have had their parole decision postponed for lack of treatment. (Tr. 3404, 3409–3413). The Industrial School for Women at Vega Alta only had a DSCA unit until 1980 and services were then provided by Hogares CREA, Inc., and Casa Providencia, a religious group.

ganization which receives substantial funding from the Commonwealth. The pre-trial detainees are normally not provided these services.

Inmates are referred to treatment modules by the sociopenal workers who identify and determine the need for treatment from an inmate's own statements, evidence of prior contacts with drugs, or, in some cases, because treatment against drug addiction is specific in the sentence imposed by the Commonwealth courts. After approval by the Classification and Treatment Committee an inmate is once again evaluated by DSCA personnel. Neither the sociopenal workers nor the DSCA therapists know each other's criteria for identifying and defining drug-addiction or treatment needs. The criteria used by sociopenal workers and therapists at the several institutions are also unclear: misidentifications have occurred. Evaluation does not include physical or psychological testing.

Therapists send descriptive reports of an inmate's therapy history to the sociopenal worker in charge of his case. This information may be included in the report forwarded to the Parole Board and used to grant or deny parole, yet DSCA employees do not know the standards applied by the Parole Board, they do not coordinate their work with Board personnel and they ignore the weight given by the Board to the information which they originate.

No studies have been made to determine the treatment needs of the inmate population and no studies have been made to determine the efficacity of the treatment delivered to inmates.

When an inmate is transferred from one to another institution the DSCA therapists prepare reports for referral to the therapists at the receiving institutions—if there is a treatment module there. Since transfers are recommended and approved by Administration personnel, an inmate is not necessarily moved to an institution where DSCA treatment facilities are available, and inmates have been in fact transferred to institutions which do not provide therapy services and their treatment has been disrupted. DSCA also operates residential programs outside the prisons. Transfers to these residential programs are recommended by the CTC and are approved by an Interagency Committee which is composed of Administration and DSCA personnel under the authority of the Director of the Administration's Penal Institutions Program. The Director, however, does not supervise the Committee and merely signs the transfers. Although the criteria for admission to the residential programs are initially to be found in statutory law,[8] there is no uniform understanding of what is required to make a successful application for a transfer. Generally, an inmate must

8. In using "systemic" or "systematic" we do not mean to suggest that the evils which we set out in this opinion are beyond the control of the individuals who work—at all levels—for the Administration. The defendants and their employees have developed a callousness to suffering and an indifference to slip-shod practices which can only be characterized as intentional indifference to the conditions of life inflicted by them on the plaintiff class. Dr. Rundle noted, as did other experts and as is clearly shown by the videotapes and photographs in evidence, that a sense of duty in one administrator can make a difference. For speaking of conditions at Aguadilla he pointed out that:

[ * * * ] I should say that just in general the institution at Aguadilla in many ways showed a much more effective housekeeping and organization than any of the other prisons which I visited. It was clear that the superintendent was trying to provide services with very little resources.

He had gotten community people involved. He had a nurse volunteer that came in. He had a community group which donated money to provide medication and the institution, although very old, was for the most part clean and although it suffered from the same problems with the bathrooms and the toilets not working well and that sort of thing, at least within the physical limits available it was kept clean and didn't present the kind of appearance and smell that the other places did. (Tr. 241; emphasis added).

(And see also Tr. 158–260).

Mr. Sanger Power, an expert retained by the defendants, made the same point:

And I keep saying the only reason for the difference in Sabana Hoyos from a dirty crum[m]y place, is in the quality of the supervision, the extent to which the guy that is running Sabana Hoyos wants to run a neat, clean, decent, orderly operation, or does he want to shut his eyes and the hell with it and just let things go." (Tr. 1916).

be classified in minimum custody and show an interest in rehabilitation evidenced by positive acts in the institution beyond mere compliance with institutional norms. At least one therapist also listed the completion of custodial treatment and community passes (furloughs) as requirements before a recommendation for a transfer to a residential program is made. The DSCA therapists agree that residential treatment is the only stage at which the adequacy and success of treatment can be accurately established since it is then that the addict is once again in contact with the free community and his conduct can be observed.

Treatment for drug addiction is considered by the Parole Board in reaching a decision to grant, deny or postpone parole. Sometimes it denies parole or postpones a decision because treatment records are unavailable. Board decisions which consider drug addiction and treatment as decisional factors are not uniform. Parole has been granted to addicted inmates who have not received or completed treatment. At other times it has required the initiation or continuation of treatment or a transfer when such measures have not been necessary. Parole Board decisions do not always reflect the reality of the treatment received by an inmate or his addictive status. Frequently, the trained personnel responsible for the conduct of therapy have had to take measures with which they do not professionally agree to comply with Board orders.

Treatment status is also important for admission to a half-way house which is a frequent prerequisite to release on parole.

### Expert Testimony

Both plaintiffs and defendants relied on expert witnesses to sustain their claims and defenses. Their guidance in making these findings has been of great help to the Court. It is perhaps one of the most outstanding features of this case that no matter which party retained and called the experts they all substantially agreed in their damning evaluation of conditions in the Administration's institutions. This unusual agreement among experts went so far that the defendants unsuccessfully tried to withhold from the Court the testimony of their correctional expert.

The testimony given by the experts was based on their own observations at the institutions which they visited (on occasion more than once) over a span of several months. The facts ascertained by them were abundantly corroborated by other testimonial and documentary evidence.

Dr. Frank Rundle testified as a witness for the plaintiffs as an expert witness primarily on mental illness and psychiatric problems within prisons. His testimony was also pertinent to the issue of general medical care and must be read in conjunction with the evidence given by two other witnesses for plaintiffs, Dr. Lambert King, M.D., and Dr. Antonio T. Diaz Royo, Ph.D. Dr. Rundle also testified as to the effect of prison conditions on incarcerated inmates. Defendants stipulated Dr. Rundle's qualifications as an expert and with good reason; he had extensive experience in both California and New York in the mental health problems of prison life and his academic and professional qualifications were found by the Court to be impeccable. His testimony has been given the greatest weight and credibility by the Court. His testimony best integrates the effect of the totality of conditions throughout the prisons and the deleterious effect of those conditions on the inmates. We find these conclusions, and the conclusions of all the other expert witnesses, as set out here, to be a true and accurate statement of what transpires through the penal system in Puerto Rico.

Not surprisingly, Dr. Rundle underlined the need for order and continuity in the delivery of medical and rehabilitational services to an inmate population.

THE WITNESS: I think it is imporant in all aspects of the operation for any prison system to be, in fact, a system rather than isolated institution which operates in whatever individual manner the warden or the administrative staff may impose upon it. There has to be a coordination.

So, all of the elements of the system fit together and that should apply in terms of the basic regulations that one inmate

is expected to follow in terms of his medical care or psychiatric care so that there is what in medicine is called a continuity of care. I think that the same concept should apply to programs to work, to recreation, to whatever is available to the inmates at the various institutions.

Q. And what impact, if any, does it have in the mental health of the inmate if that continuity is lacking?

A. I think it would have a negative effect in someone, for example, that is involved in a regular school program and recreation activity and work or whatever at one institution and then he is transferred to another institution where he does not have the same opportunities, he would have been working towards a goal to improve his status when he left the institution and certainly he would be affected. I think that would have a bad affect. (Tr. 2816–2817)

The breakdown of regularity and continuity in services which characterizes the Administration's operations [9] actively militates against any possibility of rehabilitation and inflicts on the inmates psychological harm:

[ * * * ] There is very little within the institutions which I saw which allow for the possibility of the inmates to further education or training or to increase their employment skills or possibilities and there is a great deal which has a direct negative effect in my opinion. There is a desocialization process which takes place in this kind of setting which makes people less capable of coping once they get out of prison and I think that would predictably happen.

Q. Doctor, you have stated in your report which has been filed in the case, the third paragraph, to make the following assumption. You stated as follows: "It is also clear that general conditions throughout the system will militate against effective rehabilitation and guar-

9. This principle was expanded in Dr. Rundle's testimony at Tr. 2809–2811:

Q. Doctor, is there any relationship between providing recreational activities to inmates and their mental health and rehabilitative process?

A. Yes, I believe there is and I think the answer has to do with two major areas.

One, recreational activities can be important in providing a constructive use of time and within the prison system, there is a great deal of time which is spent in idleness, and recreational activities of whatever sort would, I think, be useful in providing an opportunity to use that time.

In addition to that, I believe that it is important to provide an opportunity for some sort of vigorous exercise. The prison population is primarily of young men, I don't know what the figure is in Puerto Rico exactly, but in most prison systems, the average is somewhere around 24 and they tend to be young men who are often focused upon their bodies in a particular way and being in prison I think even increases that focus in this way. The prison society is such that an inmate is called to protect himself and to establish himself within the inmate society, either as someone who can protect himself or who cannot and the consequences of being unable to protect oneself in prison can be very bad in terms of being forced into things which are unwanted, including sexual activities, being subjected to assault, being subjected to the various kinds of controls which other prisoners impose on the weaker prisoners.

So, to have the opportunity to keep their body fit is very important to many of these young men in terms of establishing themselves in a position within the society where they can protect themselves.

In addition to that, vigorous physical exercise is a way of relieving or discharging what we call nervous tension or emotional tension and if that opportunity is not available, then it is going to come out in some other way and I think often, in prisons, where there is not the opportunity for that kind of recreation and activity, it comes out often in hostility or actual physical altercations between inmates or even inmates and staff.

Q. Would it make any difference, doctor, as to whether the type of recreational facilities or programs which is provided is outdoor recreational, indoor recreation.

A. I think it makes a difference, well, indoor recreation can also be of a vigorous sort if there is a facility such as a gymnasium, for example, and I think in that instance the opportunity to discharge tension would be pretty much equal.

Beyond that, I think, however, to have the opportunity to be outdoors is important. I guess it is from the common sense point of view to be able to be out in the sunshine and to see the surrounding landscape is important to all of us but to people locked in a prison it is even specially important, but probably the major difference is that usually outdoor space is large enough so that vigorous activities such as organized sports can be engaged in.

antee that most inmates will be more socially incapacitated upon release than upon the entrance into the system."

This is the report of Doctor Rundle, the first paragraph first page continues on the second page.

I would like you to elaborate on this assertion and what do you mean by this?

A. I think I have partially explained that on what I just said. It also includes the fact that there is almost no reasonable medical care provided. That means that people are going to be agressive (sic) in terms of developing physical illness, some of which may produce permanent disability and the general lack of opportunity as they said, educational programs, vocational training programs of any kind of activity which would constructively equip someone for life outside the prison and there is a process which goes on within any prison system which has been described by the term infantilization, but which describes a progressive loss of initiative and the kind of submission to a situation in which there is no autonomy, which has no opportunity for independent action or decision.

*That condition exists in any prison but I think it is present to an extraordinary degree in what I have seen here.* (Tr. 285–286; emphasis supplied).

These conclusions are not generally stated propositions: they are grounded on a multiplicity of factors which affect behaviour and which are intensified by the fact of imprisonment. The lack of security which we have noted is one of these factors:

In a prison setting which is a closed social system and very small from which there is no escape I think the knowledge that violence might fall upon one is going to simply increase the level of anxiety about one's safety and one's life for that matter and I know from experience in working within a prison in which violent deaths were occurring at a very high rate, this was at Soledad, my first prison experience. It led to a situation within the prison which I called, at that time, "institutional paranoia" and others have also used that term in which everybody is afraid of everybody else. Nobody trusts [any]body else and everyone feels that he has to be ready at any moment to defend his life and that leads to another effect in prisons which I think, in a way, only promotes further violence and that is that the inmates would produce some sort of weapon because they feel they must defend themselves and be prepared to meet this violence and I think that kind of atmosphere in which everybody is afraid, nobody trusts anybody and people are armed to defend themselves just promotes and aggravates that kind of situation. (Tr. 2822)

Present in the institutions is also the deleterious effect of enforced inactivity and the lack of educational and recreational programs and facilities which also contributes to the high level of violence in Puerto Rico's penal institutions:

The Court: [ * * * ] Am I correct in understanding that recreational facilities are part of the penal environment which would be conducive to assisting the inmates in his rehabilitating process?

The Witness: Yes, I believe that and especially with the younger age group with whom the opportunity at least for vigorous physical exercise I think is very important. Not only in mitigating a lack of nervous tension which results from closed confinement but I think it is also a positive factor in managing an institution, especially again in terms of outside recreation which can be vigorous such as sports. I believe that the incidents of difficulties … in a prison can be reduced if there is a very active recreation program and also with the sort of recreation activities which can occur indoors. I think one of the most negative aspects of these prisons and many other prisons is the almost total enforced idleness, with really no challenge to one's intellect, without a challenge to one's physical body. It creates an attitude of hopelessness and futility which I believe in the long run have harmful effects. (Tr. 226–227).

The same would also be true about work opportunities, according to Dr. Rundle:

A. Work and ones involvement in work and satisfaction with work and, I think is considered by all people in behavioral sciences as an important part of a man's mental well being and I think that it is true in prisons as well as anywhere else. And in prisons as elsewhere, I think the opportunity to do work which is considered meaningful by the person is important. I mean, there certainly are many people in the general society who work at jobs they don't find very meaningful, certainly because they must work and support themselves.

But I think generally people strive to find work which they find satisfying. Within the prison there is not very much choice in terms of what work is available and I think very often the jobs are of a sort which most people don't find very rewarding or meaningful, like working in the cell blocks, keeping the place clean, in the kitchen, in the laundry, that sort of thing. I think generally it is just seen as a job that has to be done and it is not meaningful but most inmates would rather work than not work. They would rather work in any kind of job that they could and I think it is very important that a work opportunity be made available to all inmates. (Tr. 2813–2814).

Dr. Rundle also noted the need to maintain efficient and available social services since the inmates must rely on social workers to stay in touch with the outside world and to adequately organize their life in prison. The uncertainties of standards on which parole is granted further contributes to maladaptation and stress in the prisoner's life and to recurrent violations of regulations which extend the inmate's sentence. (Tr. 2830–2832).

All of these problems are exacerbated and magnified by overcrowding. (Tr. 233–234).

Finally, Dr. Rundle established the adverse effects that the need to seek protective custody has on inmates. Not only is the need for self-help pressed on the prisoner since the Administration must resort to locking him up to protect life and limb, the fact of segregation increases the inner conflicts of the inmate who must choose between personal security and the programs which are held out to be the way to rehabilitation and early release.

Dr. Antonio T. Diaz Royo, Ph.D., coincided to a large extent with Dr. Rundle's evaluation of prison conditions but also clarified the malfunctions of several procedures in the penal system. A clinical psychologist, Dr. Diaz Royo stresses the need for an interdisciplinary approach to classification decisions. The scarce psychological resources now at the Administration's disposal are not being properly utilized. Classification at an early stage is necessary to segregate inmates and prepare proper diagnoses which will not only help in the plans for individual rehabilitation but also would tend to predict and prevent situations in which violence can occur. The present conditions of overcrowding and inadequate classification resulting in commingling of diverse types of offenders negate any positive effects which the classification manual in use can have.

Penal guards, who are not adequately trained, are placed in conditions which push them to develop defense mechanisms by which the guards stereotype inmates as dangerous and incapable of rehabilitation, a defense mechanism which often results in strategies of authoritarianism and arbitrariness in dealing with inmates.

The plaintiffs' correctional expert, Dr. David Fogel, Ph.D., established that the mingling of convicted felons, misdemeanants and pre-trial detainees is against all correctional standards and increases the extraordinary rate of violence in the penal system in Puerto Rico. The penal guards and inmates cannot establish meaningful institutional relationships and this results in a greatly diminished capacity to control, conduct and deter unwanted behavior since the inmate culture goes unobserved and they are left to their own devices. A self-fulfilling prophecy then becomes the guards' modus operandi: it is dangerous to go into dormitories so the guards do not go into the dormitories which of course become dangerous. This attitude is also reinforced by the fact that guard functions are

grossly undermanned at some institutions, bad classification procedures and improper training and supervision.

The intense overcrowding and lack of personal security forces inmates to live in conditions of tension and animosity which even invalidate psychological and psychiatric evaluations after an individual is exposed to the prevalent living conditions. The stress caused by overcrowding should be relieved by allowing inmates to participate in out-of-dorm or cell activities on a rotating basis, which, from the evidence before the Court, does not happen. Dr. Fogel also found that the educational, work and recreational programs are sporadic in operation, poor in quality, undermanned and, as everything else, deficient in record-keeping. They are not adapted to correctional needs: school programs for example, run for only ten months. The unavailability of programs and their haphazard organization deprive inmates of work and study time credits and extends the time of incarceration.

### Administration by Improvisation

The defendants retained through counsel Mr. Sanger B. Power as their correctional expert. For an egregious but not untypical incident the defendants tried to keep Mr. Power's testimony from the Court. Mr. Power visited Puerto Rico's penal institutions as defendants's announced expert while hearings on the preliminary injunction were being held. A tight schedule for the visit and for Mr. Power's deposition by the plaintiffs prior to his testimony in Court was arranged. The plaintiffs' first subpoena to depose Mr. Power was quashed by the Court as not in accordance with the schedule. At this point the defendants decided not to call Mr. Power and to fly him out of Puerto Rico over the week-end. The plaintiffs then served a second subpoena on Mr. Power and noticed his deposition. Without informing the Court of their changed plans, counsel for the defendants obtained an ex-parte order to quash the subpoena and Mr. Power left Puerto Rico. Upon being fully advised on the matter the Court ordered the defendants to produce Mr. Power in Puerto Rico

to be deposed by plaintiffs. His deposition was taken and, after the determination of objections by the defendants, read into the record. The defendants had reason to fear the testimony of their own expert.

Mr. Sanger B. Power has had thirty years' experience of correctional administration. He was the Warden of the Wisconsin State Penitentiary, Administrator of the Wisconsin Division of Corrections, and occasionally, Chairman of the Parole Board. He also was responsible for non-custodial programs as Administrator of Corrections, and the population of the institutions which he supervised was as varied as it is in the Commonwealth's institutions.

Two things struck the Court in reading Mr. Power's testimony: he is as tough as he is honest. He was also appalled at what he saw although he made gallant efforts not to express harsh opinions. When, for example, asked to evaluate the abilities of the then Administrator, he answered:

> I would prefer not commenting on her ability, because I am not sure it would be fair to her, because I don't know her that well.

> She is a nice person, and I understand a very fine person, professionally competent in her field, which I think is social work.

> I can only say that her office, the [Administration] has not shown the kind of leadership qualities that I think are needed, and all you've got to do is go around and look at these joints and you can see what I mean. (Tr. 1919).

Mr. Power returned again and again to the same theme: The Administration is run on the principle of abdication of individual responsibilities: when asked to clarify a statement made in his report to the Administration to the effect that "It is disturbing yet typical, of finding the superintendent of Bayamón saying in his sworn statement that [t]he responsibility to maintain the Bayamón Jail in a state of cleanliness is the responsibility of the inmates of said institution"[,] he answered:

> Well, that was in the deposition of the warden or the statement of the warden

when he was asked who was responsible for the cleanliness, and he said it's the inmates responsibility.

And I find that shocking. Because I don't think it is the inmates responsibility. Because I think it is the responsibility, as warden, to see that the joint is clean.

Now, I think that he can delegate a lot of these responsibilities, and maybe it will end up with the inmate being responsible for keeping his own cell clean; that is fine. But to suggest that because the place is dirty, that it's the inmates fault, is what I am saying is a concept that has got to be changed.

You can't buck responsibility down to the inmates. That is a management responsibility. (Tr. 1970–1971).

And the Administration's overwhelming incompetence in running the institutions it purportedly operates clearly comes through.

Q. [ * * * ] My question is really directed to: do you feel that in order to implement any solution, the Court will have to name a master or a third person who will come in and do what they are doing in Rhode Island, for example?

A. I think that the administration that is there has demonstrated, by what I saw, for whatever reason it may be, an inability to run these institutions and establish, maintain acceptable standards.

You can see it. And it just seems to me that the Department of Corrections is going to, probably, need some money; these things cost money, to be sure. If you don't get enough money, nobody can do it. Okay?

But they are going to have to grab ahold and knock some heads together and ride herd out there. I like people in the states who are running institutions.

And I keep saying the only reason for the difference in Sabana Hoyos from a dirty, crummy place, is in the quality of the supervision, the extent to which the guy that is running Sabana Hoyos wants to run a neat, clean, decent, orderly operation, or does he want to shut his eyes and the hell with it and just let things go.

But there has got to be strong, central direction and continuing supervision to see that the policies are, in fact, carried out. And there have to be standards established for such things as kitchens; Standards with respect to overall maintenance; plumbing, ventilation, the whole bit.

And I have not seen anything that suggests that the present administration has been doing that. And I seriously question that they can.

I think they need a strong director; capable of establishing goals, and the kind of personnel that he needs to see that things get done.

I don't want to say, yeah, that the Court should appoint a master or the Court should not appoint a master. I don't know whether I could properly—I tell you, I don't know.

Q. But in some of the cases that you have intervened, that has been the way of doing things, of implementing the Court's order, naming a master who would oversee the system?

[A.] In Rhode Island, they did appoint a special master, and I guess I would have to say, if they hadn't done it, they might not be as far along as they are. (Tr. 1915–1917).

After a change in the Commonwealth's Government and a number of Administrators later, the Court, in September 1985, upon motions made by both sides, ordered the Administration to produce basic statistical information on the Administration's daily operations and on specific points of security measures long ago recommended to the Administration by its own chosen advisors and consultants. Voluminous documentation was filed in response to this order. Then the continuing disarray of administrative and supervisory functions became apparent—unbelievably worsened.

The Administration had again, hired a consultant. Mrs. Mercedes Vargas, who has worked as a researcher in various projects in the criminal justice area, was retained to do a study of the Administration and its operations. She was diverted from her study to compile the information

requested by the Court. What Mrs. Vargas revealed in her direct and cross-examination was the continued state of disarticulation to the point of anomie which still persists in the penal institutions. She described the system as a "complete, or almost complete improvisation." (Tr. Sept. 30, 1985, hereinafter T.H., at p. 58). This is so because "... this is basically an undocumented system in many, many vital areas. The policies and procedures are not written and are not known and there is no supervision—first of all there is no adequate dissemination and second, there is no adequate supervision to see if the people are carrying out things that they should be." (Ibid.)

The situation concerning classification was described by Mrs. Vargas as in a flux. "They've been testing it, to the best of my ability I could not locate what the normative picture is right now." (T.H. 57). And classification practices "... differ from institution to institution and are overall inadequate." (Ibid., and see T.H. 81). Nor could the Administration provide information about the time inmates spent in protective custody. (T.H. 56). And about security in general, Mrs. Vargas noted that recommending what the regulatory scheme should be, since the recommending has already been done: "However, it is important to determine what is the status of the regulatory fixture [sic] in the institution[s], because, as of now the, what we have been able to determine is that nobody knows for certain which regulations are—exist for what aspects, which exist but have not been approved, have been drafted but have not been approved, which [have] been approved but are not being implemented, etcetera." (T.H. 60).

There was, of course, no improvement in overcrowding and therefore no compliance with the preliminary injunction. To a question on overcrowding the answer was: "Improvement in actual overcrowding, no, of course not. The—I mean, [the] mathematical fact [is] that it is worse." (T.H. 66). There are no records on recreational services (T.H. 83).

Counsel for the defendants admitted that "The defendants have established that the information system existing in the system is not verifiable." (T.H. 79–80 and 88). Counsel for defendants finally invited the Court's intervention: "Mr. RAMIREZ: We would not object to orders from the Court. We would like to have orders from the Court with specific issues and comply with that." (T.H. 99). That is an invitation which the Court must accept without overstepping the acknowledged limitations on the judicial function particularly in the area of prison litigation. Our immediate need, however, is to obtain accurate facts: by orders of even date the Court appoints two Monitors whose first duties will be to ascertain what is going on in the institutions which the Administration purports to operate. The defendants have objected to such an appointment but the Court cannot join them in the game of blind-man's buff by which they claim to administer a prison system. To enter specific orders without a factual basis and without a neutral observer responsible to the Court for evaluation and supervision of compliance with the issued orders would prolong the state of confusion which now exists in Puerto Rico's prisons.

### The Implementation of the Preliminary Injunction

On September 5, 1980, the Court entered a preliminary injunction in this case, *Morales Feliciano v. Romero Barceló*, 497 F.Supp. 14 (P.R.1979). This Opinion and Order in no way affects that preliminary injunction. The measures mandated then had a temporary ameliorating effect on the delivery of health services in the Commonwealth's prison system. The plaintiffs twice sought and twice failed to hold defendants in contempt. But the last hearing on an order to show cause led, on the plaintiffs' motion acceded to by the defendants, to a series of inspections by the Court which have made it abundantly clear to us that non-compliance is greater than any improvement which may have occurred for a time. But improvement there was and what improvement there was was due to the Court's intervention. See, for example,

the testimony of Dr. Frank Rundle, M.D., plaintiffs' own expert at the hearing held on October 5, 6, 1981 (Transcript *passim*, pp. 363–424). The program which produced these improvements has been dismantled within the last year.

Numerous compliance reports have been filed by the defendants, motions have been made to modify the injunction, to supplement the record, to release prisoners, hearings have been held, and attempts to reach a settlement have been frustrated mostly by the defendants' inability to come up with precise information and their unwillingness to commit themselves to specific goals that will turn the Administration around.

Nothing has been done to alleviate overcrowding. As the Administrator's own consultant admitted last September, the mathematical fact is that overcrowding is worse. Since 1980 one Administrator after the other has placed expectations for relief of overcrowding in a new institution to be built in Western Puerto Rico. The institution was built. And, then, through the political processes of the Commonwealth, the institution was determined to be better used as a hospital—for which purpose substantial amounts of money will be expended. The monstruous overcrowding inflicts on the plaintiff class living conditions which can only be called brutalizing. And a substantial number of that class, it will be remembered, are pre-trial detainees who, whatever restrictions may be imposed constitutionally on their liberty, must not be punished. Living conditions in Puerto Rico's prisons are unusual in the extreme— almost without parallel in the literature on prison conditions that we have canvassed— and the cruelty of the punishment inflicted on those who may be punished is hard to believe.

The Court finds that continued litigation in a traditionally adversary pattern would protract the proceedings in this case and waste judicial resources, the time and energies of able counsel and the Administration's own resources. The time needed to establish a factual record through the Court's normal operations requires the presence in San Juan and in this Court of inmates dispersed through Puerto Rico, government employees who should be at work, records and medical charts, and the expenditure of money which such mobilization entails. The process has been expensive, cumbersome and inefficient. We therefore find that the appointment of two Monitors under Rule 53 Fed.R.Civ.P. is the proper and, in this case, even the necessary way to proceed. Otherwise, this Court would have to sit almost exclusively, and, for an indeterminate time, on this one case just to determine the factual issues in this case and to supervise the implementation of its decree.

The Court has given the Administration and all of the defendants enough of an opportunity to act on the conditions which for so long have been obvious to them. We must now pursue another route. *Morris v. Travisono,* 707 F.2d 28 (1st Cir.1983).

## THE LEGAL STANDARDS

■ The Eighth Amendment to the Constitution of the United States prohibits "cruel and unusual punishment" and is applicable to the Commonwealth of Puerto Rico either through incorporation into the Due Process Clause of the Fourteenth Amendment, *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), or because the Eighth Amendment itself is applicable to Puerto Rico since a long history of its application here shows that it poses no dangers to national interests or risk of unfairness. *See, Torres v. Puerto Rico,* 442 U.S. 465, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979). There is further clear indication that the Congress has implicitly determined that it should be so. Act of March 2, 1917, c. 145 § 2, 39 Stat. 951. We, therefore, hold that the Eighth Amendment prohibition of cruel and unusual punishment is applicable to the Commonwealth of Puerto Rico.

■ The statement of the facts in this case identifies the applicable legal standards. The conditions which have prevailed in the prisons of Puerto Rico result from deliberate indifference to the medical and basic human needs of the plaintiff

class and constitute the unnecessary and wanton infliction of pain, which is forbidden by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed. 2d 251 (1976), *citing, Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell and Stevens J.J.). Those conditions are also totally without penological or other justification. *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). This case is so far from a problem of double-celling at an "unquestionably top-flight, first class facility[,]", 452 U.S. at 341, 101 S.Ct. at 2396; *Chapman v. Rhodes*, 434 F.Supp. 1007, 1009 (S.D.Ohio 1977), that our only problem in holding that the Eighth Amendment rights of the plaintiff class have been violated, arises from the fact that minimal constitutional standards are so far above what we have found in these prisons that it is difficult to establish a conceptual relationship between the conditions now existing in Puerto Rico's jails and the standards elaborated by other federal courts. The Eighth Amendment "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency ...'", 429 U.S. at 102, 97 S.Ct. at 290, *quoting, Jackson v. Bishop*, 404 F.2d 571, 579 (8th Cir. 1968), and it forbids "punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society.'" 429 U.S., *Ibid.*, *quoting, Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (other citations omitted). The Administration, however much of an administrative improvisation it may be, seems to be designed to violate every principle and standard deducible from the Eighth Amendment.

*Rhodes v. Chapman*, 452 U.S. at 346–347, 101 S.Ct. at 2399, has pointed out a path for decisions by pointing out that "The Court has held, however, that Eighth Amendment judgments should neither be nor appear to be merely the subjective views of judges. To be sure, the Constitution contemplates that in the end a court's own judgment will be brought to bear on the question of acceptability of a given punishment. But such judgments should be informed by objective factors to the maximum possible extent. For example, when the question was whether capital punishment for certain crimes violated contemporary values, the Court looked for objective indicia derived from history, the action of state legislatures, and the sentencing by juries." (Citations, quotation marks and brackets omitted).

The Court went on to specify at page 347 that:

These principles apply when the conditions of confinement compose the punishment at issue. Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment. In *Estelle v. Gamble, supra,* we held that the denial of medical care is cruel and unusual because, in the worst case, it can result in physical torture, and, even in less serious cases, it can result in pain without any penological purpose. 429 U.S. at 103 [97 S.Ct. at 290] In *Hutto v. Finney,* [437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978) ] the conditions of confinement in two Arkansas prisons constituted cruel and unusual punishment because they resulted in unquestioned and serious deprivations of basic human needs. Conditions other than those in *Gamble* and *Hutto*, alone or in combination, may deprive inmates of the minimal civilized measure of life's necessities. Such conditions could be cruel and unusual under the contemporary standard of decency that we recognized in *Gamble, supra,* [429 U.S.] at 103–104 [97 S.Ct. at 290–91]. But conditions that cannot be said to be cruel and unusual under contemporary standards are not unconstitutional. To the extent that such conditions are restrictive and even harsh, they are part of the penalty that criminal offenders pay for their offenses against society.

The defendants have frequently insisted that we look to Puerto Rican realities and values in judging the case before us. Let us then look at the legislative enactments of the people of Puerto Rico to find there

societal values on punishment. The Constitution of Puerto Rico forbids capital punishment in absolute terms: "The death penalty shall not exist." Article II, § 7. And in Section 12 of the same Article the Commonwealth Constitution reads in pertinent part: "Neither slavery nor involuntary servitude shall exist except in the latter case as a punishment for crime after the accused has been duly convicted. Cruel and unusual punishments shall not be inflicted. Suspension of civil rights including the right to vote shall cease upon service of the term of imprisonment imposed." [10] Section 15 of the Bill of Rights further provides that "No child less than sixteen years of age shall be kept in a jail or penitentiary." All of these rights "shall not be construed restrictively." Art. II, § 19. And, finally, Article VI, § 19 establishes that "It shall be the public policy of the Commonwealth [...] to regulate its penal institutions in a manner that effectively achieves their purposes and to provide, within the limits of available resources, for adequate treatment of delinquents in order to make possible their moral and social rehabilitation."

Although not specifically directed to penological issues, Article II, § 1, also sheds light on the values which govern the Commonwealth's legal system: "The dignity of the human being is inviolable." This precept encompasses expansive values and operates without need of statutory enactments. *Figueroa Ferrer v. Commonwealth*, 107 D.P.R. 250 (1978).

These indicia of the community values are expanded by the statutory law governing imprisonment and parole. The Administration is regulated by the Organic Act of the Correctional Administration, Title 4 of the Laws of Puerto Rico Annotated. Section 5 of the Act, 4 L.P.R.A. § 1112, provides in part that the Administration shall have the following functions and powers:

(b) To organize correctional services to the effect that the rehabilitation shall have highest priority within the goals of the Commonwealth Government. To that end: (1) to design a new diversified system of institutions, programs, and human resources which makes it feasible to establish a better individualized treatment; (2) to proliferate the creation of smaller institutions, either semiclosed, open or of any other kind, so as to permit a treatment that will help the inmate to return to the free community within the shortest possible time; (3) to use rehabilitation methods in the community in the widest dimension possible whenever it is compatible with public security; (4) to incorporate in the rehabilitative process ample opportunities to acquire skills, training and knowledge which will expedite the inmates return to the community duly equipped to insure a decorous living; and (5) to channel the support of the citizenry to new rehabilitative programs in the community buttressed by voluntary services.

[ * * * ]

(f) To establish programs to offer adequate medical care and hospital services intended to prevent diseases and the diagnosis, treatment and rehabilitation of the patient.

The services may be furnished, whenever the circumstances so require, outside Administration facilities under the necessary security measures.

Detailed records of medical examinations and the health condition of the patient shall be kept.

(g) To create all the individualized programs which may be necessary to meet the system's requirements in order to

---

**10.** The Supreme Court of Puerto Rico has spoken on the scope of this section only with respect to issues of proportionality of punishment, *People v. Pérez,* 83 P.R.R. 221, 226 (1961), where it is stated that "With the development of civilization [...] the precept has acquired a new significance and is directed to those 'punishments so grossly and inordinately disproportionate to the offense committed as to shock the moral sense of the community.' *Hobbs v. Ward-*

*en, Maryland Penitentiary,* 223 Md. 651, 163 A.2d 331 (1960); *People v. Elliot,* 272 Ill. 592, 112 N.E. 300 (1916); *Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910); [...]." We feel certain, without of course implying any need for such a result, that the Supreme Court of Puerto Rico would find the cruel and unusual language in this section to be at least as protective of individual rights as the same language in the federal Constitution.

provide academic, vocational, and training education of any kind, under proper counseling. These programs shall be guided to meet the prevailing requirements and conditions in the labor market, with a view to obtaining adequate living means. These programs shall be envisioned, besides, in such a way as to facilitate their recognition and accreditation by the proper government and private agencies. The necessary exchange and coordination with said entities shall be maintained.

(h) To develop and obtain ever possible source of work to propitiate the rehabilitation of the inmates and help the released inmates. To broaden the opportunities of work by means of direct economic aid, incentives, subsidies, counseling or any other type of aid in order that its inmates and released inmates promote or participate in industrial, commercial, agricultural or any other kind of projects and activities.

To this effect the agencies and public corporations of the Commonwealth Government and the municipalities are hereby authorized to transfer funds or contribute with any available services, counseling or other resources to the Administration, under the conditions stated in the agreements.

[* * *]

The working conditions of the inmates shall be similar, in every possible way, to those prevailing for regular workers, subject to the regulations established.

We cannot enforce those statutory commands by injunctions. But, they are clear indications of the penological standards set by the legislative branch of the Commonwealth and indicate the societal values by which we will be guided in giving content to the Eighth Amendment principles enunciated by the Supreme Court. The high standards set by Puerto Rico's Legislative Assembly also disposes of the defendants' contention that the Commonwealth is too poor to live by nationally applicable constitutional standards: if the defendants complied with the statutory mandate, the conditions of imprisonment in Puerto Rico would be as far above the requirements as they are at present below. Furthermore, there is now more evidence of misadministration than of lack of economic resources.

■ The Administration fails in its constitutionally required obligation to provide inmates "reasonably adequate [ ... ] shelter, sanitation, medical care, and personal safety." *Newman v. Alabama,* 559 F.2d 283, 291 (5th Cir.1977). The shelter provided also fails to include, as it must, "reasonably adequate ventilation [Aguadilla, Arecibo, Ponce, Humacao, Miramar] sanitation, bedding, hygienic materials and utilities (i.e., hot and cold water, light, heat, plumbing)." *Ramos v. Lamm,* 639 F.2d 559, 568 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). Nor are fire safety conditions constitutionally acceptable throughout the system and some of these institutions are housed in buildings which are tinder boxes (Ponce, Arecibo). *Leeds v. Watson,* 630 F.2d 674, 675–6 (9th Cir.1980); *Ruiz v. Estelle,* 679 F.2d 1115, 1152–3 (5th Cir.1982).

■ Reasonable protection from the constant threat of violence, terror, physical aggression, sexual assaults, is also required by the Constitution. *Ramos v. Laam,* 639 F.2d at 572; *Woodhous v. Virginia,* 487 F.2d 889 (4th Cir.1973); *Jones v. Diamond,* 636 F.2d 1364 (5th Cir.1981), *cert. dismissed sub nom. Ledbetter v. Jones,* 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed. 2d 1033 (1981). The protection to the plaintiff class is all the more lacking when the representatives of the state government, in this case Administration officials and employees, abdicate the governance of prison life into the hands of organized, island-wide gangs.

■ The absence of rehabilitative programs is not, per se, a violation of the Eighth Amendment. *Bono v. Saxbe,* 620 F.2d 609, 615 (7th Cir.1980). But, there are considerations here which make a significant difference: the Administration is under a statutory duty to provide such programs, 4 L.P.R.A. § 1112; inmates can earn time credits towards an early release by participating in such programs, 4 L.P. R.A. §§ 1162, 1164, 1165; and the unavaila-

bility of any form of useful work, study or even recreation in the overcrowded conditions in the system, inflict serious psychological harm on the inmates. We will first examine this last point under Eighth Amendment standards.

The doctrine of psychological harm has been more frequently discussed in relation to solitary isolation than in the factual context of the totality of circumstances which characterize the instant case. As such, it was received with skeptic caution by the First Circuit in *Jackson v. Meachum*, 699 F.2d 578 (1st Cir.1983), which discussed thoroughly the issues and cases. But, in *Morris v. Travisono*, 707 F.2d 28, 32 n. 9 (1st Cir.1983), the Court made it clear that factual variations on *Jackson* do make a difference in the application of psychological deterioration doctrines. In *Jackson* the Court had already stated that "to accept plaintiff's proposition that there is a *constitutional right to preventive therapy where psychological deterioration threatens, notwithstanding that the physical conditions of confinement clearly meet or exceed minimal standards*, would make the Eighth Amendment a guarantor of a prison inmate's prior mental health. Such a view, however civilized, would go measurably beyond what today would generally be deemed 'cruel and unusual'." 699 F.2d at 583.

In this case, where none of the physical conditions of confinement meet constitutional standards, the facts of overcrowding, idleness and the threat of violence, combined with the continuous frustration of reasonable expectations produced by administrative incompetence, do result in an ascertainable psychological deterioration in the prison population which, we hold, is independently cognizable under the Eighth Amendment. *See and compare: Bono v. Saxbe*, 620 F.2d at 614; *Ramos v. Laam*, 639 F.2d at 566–7; *Hutto v. Finney*, 437 U.S. at 687, 98 S.Ct. at 2571; *Battle v. Anderson*, 564 F.2d 388 (10th Cir.1977); *Bowring v. Godwin*, 551 F.2d 44 (4th Cir. 1977) (discusses the place of psychiatric treatment in prison law). The psychological deterioration inflicted on plaintiffs in this case is "an unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. at 104, 97 S.Ct. at 291.

■ But the irregularities in the administration of work and study programs also results in violations of plaintiffs' due process rights. When those who can study or work are given these opportunities, and when the opportunities are taken away, by irregularities in classification or the Administration's inability to provide a safe environment, the plaintiffs are deprived of the liberty interest implicated in the statutorily created expectation that imprisonment can be shortened by work and study without the due process of law. *Garcia v. Batista*, 642 F.2d 11 (1st Cir.1981); *Wolff v. McDonnell*, 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974) (minimum procedures in disciplinary proceedings must be observed to insure that good-time credit state-created rights are not arbitrarily abrogated). Random deprivations which result from the reckless conduct of state officials and employees who operate an "improvised" prison system is tantamount to the arbitrary abrogation of the plaintiffs' state-created right to obtain good-time credits.

■ The same due process analysis can be used to examine the deprivation of plaintiffs' expectation to be *heard* by the Parole Board to determine their eligibility for parole which is regulated by statute, 4 L.P.R. A. §§ 1503, 1504. There is a clear expectation that, whether parole is granted or not in the Board's discretion, an inmate will be heard and allowed an opportunity to establish his eligibility. Parole is, even under restrictions, a substantial change from conditions of incarceration and implicates a cognizable liberty interest. *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). Thus, if the inmate has a right to have his eligibility determined, the capricious and arbitrary denial of an opportunity to be heard is a deprivation of liberty without the due process of law. To prepare his application for parole the inmate must repy on a social-penal worker: they are overworked to the point of inefficiency, ignore the criteria for granting or denying parole, and receive

little or no support services in compiling an inmate's dosier. The inmate must therefore rely on insufficient and speculative help and advice to prepare his hearing in spite of statutes and regulations which would, if only they were obeyed, produce an orderly and rational process.

There is little need for our present purposes to belabor the obvious. We have already dealt with medical and psychiatric services in the Court's preliminary injunction which closed the "calabozos" and also set standards to deal with overcrowding and to provide for basic hygienic needs. What must be done now is to establish the extent and, perhaps, the reasons for noncompliance and to refine the data on which the Court can enter a final injunction which will not be a *brutum fulmen* and cause further chaos in the system or become academic. The Administration has admitted its inability to provide us with information that is reliable. Further courtroom litigation, we have concluded, will be overburdensome and unduly protract the proceedings. Monitors are an imperative need in this case.

What must be clear at present is that the constitutional rights of the plaintiffs have been violated and continue to be violated. Any test that we apply establishes a violation of the Eighth Amendment because the totality of conditions in these institutions "involve the wanton and unnecessary infliction of pain" of every kind on the plaintiffs' because that pain is "without any penological purpose"; because those conditions result "in unquestioned and serious deprivations of basic human needs" and "alone or in combination, [do] deprive inmates of the minimal civilized measure of life's necessities", indeed deprive inmates of their lives. Under any "contemporary standard of decency" these conditions are cruel and unusual. *Rhodes v. Chapman,* 452 U.S. at 347, 101 S.Ct. at 2399.

The chaotic administration, the reckless indifference of state officials to the absence of standards, disorganization in procedures and to daily violations of statutory law and regulations deprive inmates of liberty without the due process of law.

■ For this memorandum opinion we have not dealt separately with the rights of pretrial detainees. Suffice it to say that the finding that they live commingled with the convicted population and that the conclusion that the conditions which prevail in all of the closed institutions are violative of the Eighth Amendment rights of convicted inmates, is sufficient basis to hold that pre-trial detainees are being punished before conviction and that they have therefore been deprived and continue to be deprived of their liberty without due process of law.

The Court therefore holds that the constitutional rights of the plaintiff class guaranteed to them by the Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States have been and continue to be violated by the defendants. Two separate orders will issue in contemplation of the entry of a final decree on plaintiffs' prayer for declaratory and injunctive relief.

### ORDER OF REFERENCE

■ In a Memorandum Opinion entered this date the Court has found that there is widespread noncompliance with its September 5, 1980, preliminary emergency injunction and that conditions throughout Puerto Rico's adult penal institutions are unconstitutional. For the reasons set forth in this Order of Reference, the Court will appoint two Court Monitors to make a current assessment of the state of defendants' compliance with its September 5, 1980, order, to report on conditions disclosed by evidence subsequently heard and seen by the Court, and to prepare a proposed detailed remedial order calculated to bring about constitutional conditions throughout the correctional system. On receipt of the Court Monitors' findings and recommendations, and after independent review of those findings and recommendations, the Court will issue a final order, including complete findings of fact and conclusions of law, and a comprehensive remedial injunction including the continued use of the Court Monitors to monitor defendants' compliance with that injunction.

This action was commenced by a prisoner's letter addressed to the Court on November 9, 1978. Counsel was appointed to represent the complainant on January 3, 1979, and a complaint was filed on February 7 of that year. Following certification of the action as a class action pursuant to Rule 23 F.R.Civ.P. and lengthy discovery, a hearing commenced on May 27, 1980, on plaintiffs' motion for a preliminary injunction. After 17 days of hearings, the Court, by order entered on September 5, 1980, granted emergency relief to the plaintiff class in a number of areas. *Feliciano v. Barceló,* 497 F.Supp. 14 (D.P.R.1979).[1] Further proceedings on plaintiffs' application for permanent injunction were held from November 12, 1980, through March 2, 1981. The Court has supplemented the record by admission of documentary evidence at various times since then. In addition, between May 23 and June 30, 1984, the Court personally inspected Bayamón, the State Penitentiary, the Intensive Treatment Unit (UTI), Miramar, Guayama, Camp Guavate, Ponce, Arecibo, Humacao and Vega Alta. On October 28, 1985, the Court again visited Bayamón, Ponce, the State Penitentiary and the Intensive Treatment Unit (UTI). Without question, all evidence received and viewed by the Court to date demonstrates that conditions throughout Puerto Rico's correctional system fall far short of constitutionally mandated minimum standards and conditions.

On August 26, 1985, the Court directed defendants to report on the state of their compliance with the Court's September 5, 1980, preliminary injunction. By defendants' own admission during the course of a hearing held on September 30, 1985, the report filed by them was not reliable for lack of proper verification. Nonetheless, the Court finds that defendants' report corroborates the Court's finding of pervasive unconstitutional conditions in all of Puerto Rico's prisons, as well as defendants' inability or unwillingness to provide the Court with accurate information regarding defendants' state of compliance with the September 5, 1980, order.

As the Memorandum Opinion entered today demonstrates, the Court's 1980 order has been largely ignored by defendants. The record of intransigence and lengthy noncompliance by defendants constitutes an "exceptional condition" within the meaning of Rule 53(b) authorizing the appointment of a Court Monitor. *Gary W. v. Louisiana,* 601 F.2d 240 (5th Cir.1979). This record also convinces the Court that the achievement of compliance with the Court's current and prospective remedial orders in this case will be unusually difficult and complex, and that, in the absence of a reference, such compliance is unlikely ever to be achieved. Antiquated, overcrowded facilities, several of which may be unsalvagable for the continued housing of prisoners, longstanding tolerance by defendants of filthy and dangerous conditions throughout many of the institutions involved in this action, and the apparent inability or unwillingness of successive Correction Administrators to make significant progress toward compliance with the Court's 1980 order all mandate the appointment of a Court Monitor. Indeed, all of the factors cited by another district court and approved by the court of appeals as justifying the appointment of a special master are present in this case:

> the difficulty of superintending the implementation of "a comprehensive, detailed plan for the elimination of the unconstitutional conditions found to exist in the Texas prison system"; TDC's "record of intransigence toward previous court orders requiring changes in TDC's practices and conditions"; the "strained" working relations between TDC's lawyers and the plaintiffs' lawyers; TDC's failure to acknowledge even "completely evident" constitutional violations; and TDC's failure to conform its actual practices to its written policies and procedures.

*Ruiz v. Estelle,* 679 F.2d at 1160 (5th Cir. 1982).

Thus, the appointment of a court monitor in this case is fully justified under the "exceptional condition" requirement of

---

**1.** The reported opinion is incorrectly dated January 3, 1979.

Rule 53; moreover, it is equally clear that the rule

> does not terminate or modify the district court's inherent equitable power to appoint a person, whatever be his title, to assist it in administering a remedy. The power of a federal court to appoint an agent to supervise the implementation of its decrees has long been established....
> The function is clear, whatever the title.

*Ruiz v. Estelle*, 679 F.2d at 1161 (5th Cir. 1982). This principle was enunciated by the United States Supreme Court in *Ex parte Peterson*, 253 U.S. 300, 40 S.Ct. 543, 64 L.Ed. 919 (1920), in the following language:

> Courts have (at least in the absence of legislation to the contrary) inherent power to provide themselves with appropriate instruments required for the performance of their duties.... This power includes authority to appoint persons unconnected with the court to aid judges in the performance of specific judicial duties, as they may arise in the progress of a cause. From the commencement of our Government, it has been exercised by the federal courts, when sitting in equity, by appointing, either with or without the consent of the parties, special masters, auditors, examiners and commissioners.

253 U.S. at 312–313, 40 S.Ct. at 547.

The appointment of agents to supervise the implementation of remedial decrees in institutional reform litigation involving prisons and jails is well precedented. *See,* Nathan, *The Use of Masters in Institutional Reform Litigation,* 10 Tol.L.Rev. 419 (1979), and *Special Project,* "The Remedial Process in Institutional Reform Litigation," 78 Colum.L.Rev. 784 (1978). Precedent for such an appointment exists in this circuit as well as in others. *Palmigiano v. Garrahy,* 443 F.Supp. 956 (D.R.I. 1977); *Bel v. Hall,* 392 F.Supp. 274 (D.Mass.1975).

For the reasons set forth above, as well as those detailed in its Memorandum Opinion of this date, the Court hereby APPOINTS Vincent M. Nathan and Frederick Byers to serve as Court Monitors in this cause. Both Messrs. Nathan and Byers are members of the law firm of Nathan & Roberts, in Toledo, Ohio.

Mr. Nathan graduated from the University of Oklahoma College of Law in 1959. He was a member of the faculty of the College of Law of the University of Toledo for 16 years, during the last 10 of which he served as a professor of law. He has been appointed by district courts to act as a special master or special monitor in five cases: *Taylor v. Perini,* involving Marion Correctional Institution in Marion, Ohio; *Jones v. Wittenberg,* involving the Lucas County Jail in Toledo, Ohio; *Guthrie v. Evans,* involving Georgia State Prison in Reidsville, Georgia; *Ruiz v. Estelle,* involving the entire Texas prison system; and *Duran v. Anaya,* involving all medium, close and maximum security prisons in the State of New Mexico.

Mr. Nathan is the author of "The Use of Masters in Institutional Reform Litigation", 10 Tol.L.Rev. 419 (1979), which was republished and distributed by the Federal Judicial Center. He has served as a consultant for the National Institute of Corrections and is an acknowledged expert in the field of implementation of judicial decrees in a correctional setting. Without question, he is the most experienced individual in the United States in monitoring compliance with federal court decrees relating to prison and jail conditions, having been appointed by district courts throughout the country to oversee compliance with complex remedial orders in litigation virtually identical to that in Puerto Rico.

Mr. Byers is a 1981 graduate of Harvard Law School. From June 1981 through August 1982 he served as law clerk to the Honorable William Wayne Justice, Chief Judge of the United States District Court for the Eastern District of Texas. During the period of his clerkship, Mr. Byers assisted the district court in numerous proceedings relating to its remedial order in *Ruiz v. Estelle.*

Like Mr. Nathan, Mr. Byers has had exceptionally broad experience in monitoring remedial decrees in institutional reform litigation. He served as Assistant to the Special Monitor in *Guthrie v. Evans* and is

the Deputy Special Master in *Duran v. Anaya,* cases that have been mentioned above. In April 1984 Mr. Byers was appointed by the United States District Court for the Northern District of Georgia to serve as monitor in *Fambro v. Fulton County,* a case involving conditions in the Fulton County Jail in Atlanta, Georgia.

In summary, Messrs. Nathan and Byers represent a wealth of experience in the field of monitoring judicial decrees mandating reform of correctional institutions. They have worked together on two important cases. The scope and complexity of the problems in Puerto Rico's prisons and jails require the degree of expertise possessed by these two individuals. Moreover, the appointment of Messrs. Nathan and Byers as co-monitors will permit them to exercise full and independent authority under this order of reference to fulfill effectively the myriad responsibilities assigned to them.

In addition to appointing Messrs. Nathan and Byers, the Court will authorize the employment by the Court Monitors of two assistants. These individuals should be attorneys or correctional experts with the ability to assist the Court Monitors in executing their responsibilities under this Order of Reference. The Assistants to the Court Monitors will be nominated by the Court Monitors for approval by the Court, and their level of compensation will be set by the Court. Both assistants will be required to devote substantially full time to their assignments, and both should be fluent in the Spanish language.[2]

As their first duty, the Court Monitors shall file a report detailing defendants' current state of compliance with the Court's order of September 5, 1980, and reporting on conditions disclosed by evidence received by the Court to date. The Court Monitors' report shall recommend specific remedial action required to be taken in order to eliminate the unconstitutional practices and conditions found by the Court to exist. In particular, the Monitors shall recommend the maximum population that can be accommodated in each of Puerto Rico's institutions to insure amelioration of the unconstitutional conditions reflected in the Court's findings regarding overcrowding. In addition, the report of the Court Monitors shall address the subjects of delivery of medical care, housing and teatment of mentally ill prisoners, environmental deficiencies throughout the system, excessive use of force, classification of prisoners, denial of rehabilitative programs, inadequate treatment for drug and alcohol addiction, lack of meaningful assistance for reintegration into the community, the absence of law libraries and lack of meaningful access to courts, failure to provide adequate protective custody and protection to prisoners, absence of due process and the use of brutality in connection with the disciplinary process, enforced idleness, and violation of the Court's prior order requiring due process and equal protection in the granting of paroles, including the absence of objective standards for parole decisions and practices and procedures of defendants that have the effect of delaying parole and thereby exacerbating the crowded conditions of the institutions. After the submission of their initial report, the Court Monitors shall continue to monitor and report the state of defendants' compliance with all provisions of the Court's remedial decree in this cause and shall make recommendations to the Court concerning steps that should be taken by defendants to achieve compliance.

All actions of the Court Monitors and their assistants shall be under the direct control and supervision of the Court. In particular, the Court Monitors and other persons operating on the Court's behalf shall not intervene in the administrative management of the Correction Administration of the Commonwealth of Puerto Rico

---

**2.** In view of the fact that 21 institutions are involved in this litigation, the appointment of two Court Monitors and two assistants to the monitors is required. In *Ruiz v. Estelle,* the Special Master is assisted by five attorneys appointed to serve as monitors and five adminis- trative assistants. In *Newman v. Alabama,* 559 F.2d 283 (5th Cir.1977), *cert. denied,* 438 U.S. 915, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978), the court of appeals authorized the appointment of a separate monitor for each prison involved in that litigation.

or any of its institutions. The Court Monitors and their assistants shall not be empowered to direct defendants or any of their subordinates to take or to refrain from taking any specific action to achieve compliance. The sole power to direct compliance and to punish noncompliance remains with the Court. The duties of the Court Monitors, then, shall be to observe, monitor, find facts, report or testify as to their findings, and make recommendations to the Court concerning remedial action that must be taken in order to eliminate unconstitutional conditions that have been found by the Court to exist. The Court Monitors may and should assist defendants in every possible manner, and to this end they may and should confer informally with defendants and their subordinates on matters affecting compliance. In order to accomplish these objectives, the Court Monitors shall have the following powers:

1. The Court Monitors shall have unlimited access to any facilities, buildings or premises under the jurisdiction or control of the Correction Administration of Puerto Rico and no advance notice of any visit or inspection shall be required.

2. The Court Monitors shall have unlimited access to the records, files and papers maintained by defendants to the extent that such access is related to the performance of the Monitors' duties under this Order of Reference. Such access shall include all departmental, institutional, and inmate records, including but not limited to parole records, medical records and mental health records. The Court Monitors may obtain copies of all such relevant records, files and papers.

3. The Court Monitors may conduct confidential interviews with all staff members and employees of defendants. In addition, they may engage in informal conferences with such staff members and employees, and such persons shall cooperate with the Court Monitors and respond to all inquiries and requests related to compliance with the Court's orders in this cause. The Court Monitors may require compilation and communication of oral or written information relevant to such compliance.

4. The Court Monitors may conduct confidential interviews and meetings with any prisoner or group of prisoners under the jurisdiction of the Correction Administartion of the Commonwealth of Puerto Rico, so long as such meetings are held at the institution to which such prisoners are confined.

5. The Court Monitors may attend any parole hearing, or any formal institutional meetings or proceedings at any institution under the jurisdiction of the Correction Administration.

6. The Court Monitors may require written reports from defendants or any staff member or employee of defendants regarding compliance with this Court's orders.

7. The Court Monitors shall have the full power to order and conduct hearings with respect to defendants' compliance with the Court's orders in this cause. To this end they shall have the power to require the attendance of witnesses, including prisoners, the defendants and any employees of any defendant, and they shall exercise all other powers described in subsection (c) of Rule 53 of the Federal Rules of Civil Procedure.

8. The Court Monitors may select and employ necessary administrative, clerical and support staff. All such persons, as well as the nature of their compensation, shall be approved by the Court in advance of their employment. In addition, with advance permission of the Court, the Court Monitors may employ independent experts and specialists to assist them in fulfilling the responsibilities assigned by this Order of Reference.

9. In exercising the powers enumerated in paragraphs 1 through 6, *supra*, the Court Monitors may act by themselves or through Assistants to the Monitors approved by the Court. All actions of such Assistants, however, shall be supervised and coordinated by the Court Monitors in order to accomplish the objectives of this reference.

As has been discussed above, the Court Monitors will be responsible for submitting reports from time to time containing find-

ings concerning defendants' compliance with the provisions of the Court's orders and the need, if any, for supplemental remedial action. The following procedures shall control the submission of reports by the Court Monitors:

1. Any report prepared by the Court Monitors may be submitted to the parties in draft form as provided for in Rule 53(e)(5) of the Federal Rules of Civil Procedure. In the event that any report is submitted to the parties in draft form, the period for informal comments shall be established by the Court Monitors.

2. The Court Monitors shall file their reports with the Court. Any party may file written objections to a report of the Court Monitors within 15 days of the filing thereof with the Court. If the report has been submitted to the parties in draft form, however, no objection may be filed that has not been raised during the period for informal comments established by the Court Monitors. Otherwise, any party may file written objections to a report of the Court Monitors within 15 days of the filing thereof with the Court. The objecting party shall note each particular finding or recommendation to which objection is made, shall provide proposed alternative findings and may request a hearing before the Court.

3. Any request for a hearing before the Court must include a list of witnesses and documents to be presented at the hearing. A copy of the request for hearing, the objections and proposed findings shall be served on all parties and the Court Monitors.

4. The Court Monitors may submit reports based upon their observations and investigations in the absence of a formal hearing before them. In such event, the Court Monitors' findings must be based upon evidence that is made part of the record before the Court. Unless unobjected to, findings of the Court Monitors based on such observations and investigations shall not be accorded any presumption of correctness and the "clearly erroneous" rule shall not apply to them.

5. The Court Monitors also may submit reports based upon hearings held by them. In such instances the reports and findings contained therein shall be treated in accordance with the provisions of Rule 53 of the Federal Rules of Civil Procedure. In particular, the Court Monitors' findings of fact in these instances shall be accepted by the Court unless shown to be clearly erroneous. Any evidence not previously presented to the Court Monitors in the course of the formal hearing preceding their report shall be admitted at a hearing before the Court only upon a showing that the party offering it lacked a reasonable opportunity to present the evidence to the Court Monitors.

The Court Monitors shall not be authorized to hear matters that should be appropriately be the subject of separate judicial proceedings, such as actions under 42 U.S.C.A. 1983, and their duties shall be restricted to those set forth in this order.

Mr. Nathan shall be compensated at the rate of One Hundred and Ten Dollars ($110) per hour, and Mr. Byers shall be compensated at the rate of Eighty–Five Dollars ($85.00) per hour, for services performed in accordance with this Order of Reference. Appropriate compensation for members of the Court Monitors' staff shall be established by the Court upon the recommendation of the Court Monitors and after notice to all parties. All reasonable expenses incurred by the Court Monitors and their staff in the course of the performance of their duties, including but not limited to the rental of office space in Puerto Rico, customary office expenses, salaries of staff, long distance telephone, photocopying, printing, travel, data processing, postage and bookkeeping, shall be reimbursed. Defendants are encouraged to reduce the cost of the monitorship by providing suitable office space, office furnishings and equipment, and an automobile for the Court Monitors' use in Puerto Rico.

The cost of the monitorship shall be borne by defendants as costs in this action. The Court Monitors shall submit to the Court periodic statements of time and ex-

penses for review and approval by the Court.

Defendants are hereby ORDERED to deposit the sum of One Hundred Fifty Thousand Dollars ($150,000.00) with the Clerk of this Court as interim payment of costs. This sum shall be transferred by the Clerk to the Court Monitors, by check made payable to the Center for the Study of Law and Institutional Litigation and addressed to Nathan & Roberts, 644 Spitzer Building, 520 Madison Avenue, Toledo, Ohio 43604, for investment in an interest bearing account, and payments to the Court Monitors out of these funds shall be approved by order of the Court. All interest earned in the account established by the Court Monitors shall accrue to the benefit of defendants. As payments are approved, defendants shall deposit additional sums with the Clerk as the Court may order and direct, and these sums shall be forwarded by the Clerk to the Court Monitors in the manner and for the purpose set forth above.

The Court Monitors may cause copies of this Order of Reference, or portions thereof, to be posted in any facility under the jurisdiction of the Correction Administration of the Commonwealth of Puerto Rico, and may cause such copies to be distributed to prisoners within such facilities and to employees of any of the defendants. This Order of Reference shall be translated into the Spanish language by an official translator of the Court, and a copy of the translated order shall be sent by the Clerk to all counsel and the Court Monitors.

Any action required or permitted to be taken by the Court Monitors under this Order of Reference may be taken by either of them in his own name, or jointly by both of them.

IT IS SO ORDERED.